## THE NAVIS.

### DAVIDSON v. PLUMMER.

(District Court, D. Maine. May 29, 1912.)

Nos. 149, 150.

1. CONTRACTS (§ 28\*)—ACTION FOR BREACH—EVIDENCE CONSIDERED.

Evidence considered, and *held* to establish a contract as claimed by libelant, by which he was to store respondent's yacht in his yard through the winter and launch it in the spring for an agreed price, but did not contract to make it seaworthy before launching, as contended by respondent.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 133–140, 1755, 1782–1784; Dec. Dig. § 28.\*]

2. ADMIRALTY (§ 13\*)—JURISDICTION—MARITIME CONTRACTS.

The services of a watchman on a vessel are maritime services for which he may maintain a suit in admiralty.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 164–176; Dec. Dig. § 13.\*

Admiralty jurisdiction as to matters of contract, see notes to The Richard Winslow, 18 C. C. A. 347; Boutin v. Rudd, 27 C. C. A. 530.]

3. ADMIRALTY (§ 12\*)—JURISDICTION—MARITIME SERVICES—STORAGE OF YACHT'S BOATS.

The storage of the boats of a yacht during the winter is a maritime service, and is a subject of admiralty jurisdiction.

[Ed. Note.—For other cases, see Admiralty, Cent. Dig. §§ 154–163; Dec. Dig. § 12.\*]

4. SALVAGE (§ 11\*)—NATURE OF SERVICE—PUMPING OUT MOORED YACHT.

The service of a tug in pumping out a steam yacht moored in a harbor which had filled by reason of her sea cock having been left open, and was in a sinking condition, *held* a salvage service.

[Ed. Note.—For other cases, see Salvage, Cent. Dig. § 21; Dec. Dig. § 11.\*]

In Admiralty. Suit by James F. Perkins, master and owner of the steam tug Startle, against the steam yacht Navis; Charles A. Plummer, claimant, and Joseph T. Davidson, respondent under admiralty rule 59. Suit by Joseph T. Davidson against Charles A. Plummer. Decree for libelant in first case against the yacht Navis, and for libelant in second case.

In No. 149:

Benjamin Thompson, of Portland, Me., for libelant and respondent.

Guy H. Sturgis and Wm. H. Gulliver, both of Portland, Me., for claimant.

In No. 150:

Benjamin Thompson, of Portland, Me., for libelant.

Guy H. Sturgis and Wm. H. Gulliver, both of Portland, Me., for respondent.

HALE, District Judge. For convenience these two cases are heard together. No. 150, the libel of Joseph T. Davidson v. Charles A. Plummer, is for labor and materials furnished for repair and launching of respondent's steam yacht, Navis; for the storage of her boats;

and for libelant's services as watchman, after the launching of the Navis, and while lying at her mooring in Portland harbor.

[1] 1. It is contended on behalf of the libelant that in the autumn of 1908 he entered into a verbal contract with the respondent, under which it was agreed that the libelant, whose business was to build and repair boats, should haul the Navis out into his yard on a cradle to be furnished by the respondent; that he should cover her up with canvas, also to be furnished by the respondent, store her during the winter season, and in the following spring launch her and put her to her mooring; that the price for doing this work should be $50; and that any other such work which it might be necessary for the libelant to perform should be paid for by the respondent at fair prices. The respondent says that, under the contract, Davidson was, not only to perform the services which I have just enumerated, but that he was also to make repairs, and do all things necessary to make the yacht tight, staunch, and seaworthy. The first sharp contention between the parties is: What were the terms of the contract between them, respecting the hauling up and launching of the yacht? With reference to the other services, beyond those for which he was to receive $50, Davidson says that, in his contract with the respondent, there were no particular details as to the work required in the spring; but that Mr. Plummer promised him that whatever work had to be done in the spring by way of repairs, he, the libelant, should do preparatory to the yacht's going into commission; that nothing whatever was said by Plummer in relation to putting upon Davidson the responsibility of making the yacht tight, staunch, strong, and seaworthy; and that he, Davidson, did not have the right to go on and do anything he chose without Plummer's sanction. Davidson says that at the time he hauled the yacht out in the fall of 1908 Plummer's engineer was by her and remained a week or ten days, and was at work on the engine; that he, Davidson, took no part in this work, and did not see what the engineer was doing, for Davidson knew nothing about machinery. I have heard, and carefully reviewed, the testimony of the parties. There is a sharp conflict of evidence. But I think the weight of evidence is with the libelant on this point. The whole testimony leads me to the conclusion that the libelant was to make such repairs in the way of caulking and painting the bottom and top sides as Plummer might direct; that no intention of the parties is proved for Davidson to assume the responsibility in reference to the condition in which the machinery or connections were to be left; and that there was no consideration for any agreement such as the respondent has undertaken to set up. All the testimony, taken together, does not lead me to believe that Davidson undertook to agree that the yacht should be· seaworthy when she was launched, especially that she should be seaworthy, so far as such seaworthiness depended upon her piping, machinery, or outboard connections. It appears that Davidson had no competent knowledge of the connections on steam yachts, and that he had never had anything to do with engines. The contract as claimed by the libelant is the natural contract to be expected under the circumstances of the case. Upon the contract, as understood by Plummer, there was clearly no meeting of the minds or mutuality of con-

sent. All the elements to make such a contract were lacking. If the respondent supposed that such a contract was within the understanding of the parties, he was clearly laboring under such a misunderstanding as was commented upon by the Supreme Court in National Bank v. Hall, 101 U. S. 43, 49, 25 L. Ed. 822. I have found it valuable in this connection to study the tests applied by courts in reference to the existence of a contract. In Utley v. Donaldson, 94 U. S. 29, 47 (24 L. Ed. 54), Mr. Justice Swayne said:

"There can be no contract without the mutual assent of the parties. This is vital to its existence. There can be none where it is wanting. * * * Where there is a misunderstanding as to anything material, the requisite mutuality of assent as to such thing is wanting; consequently, the supposed contract does not exist."

And the court cites many interesting and suggestive cases. Upon the same point there is a valuable suggestion in Fire Insurance Association v. Wickam, 141 U. S. 564, 579, 12 Sup. Ct. 84, 35 L. Ed. 860; Philpot v. Gruninger, 14 Wall. 570, 577, 20 L. Ed. 743. After studying the testimony in the light of the decisions of the courts, I come to the conclusion that the contract was as asserted by the libelant.

The respondent goes further and says, not only that the libelant did not carry out his contract of making the yacht seaworthy when he launched her, but that he carelessly and negligently left open the sea cock on the intake pipe in her engine room, and also her water-closet connection; so that, by reason of this careless and negligent omission, the yacht, when launched, was not in a seaworthy condition, but took water through the intake pipe and was greatly damaged; and that thereby the respondent was put to loss. Upon a careful review of the case, I find that the weight of the evidence is against the respondent upon this point. The testimony leads me to believe that Davidson expected Plummer to have some one familiar with the engine and the machinery to look after them, and that he thought, and had reason to think, that this had been attended to when the yacht was put overboard in the spring; that, while Davidson knew there were inlets and outlets to a marine boiler, he did not know whether they were left open or closed, and he did not regard that as any part of his business. The testimony shows an interview between Plummer and Capt. James F. Perkins in which Plummer said, substantially, that he had a man go over to the Navis to connect up the condenser, and that the man must have neglected to close the sea cock. Without going into the details of the testimony, I find that the conduct of the parties and all circumstances of the case are inconsistent with the position of the respondent touching this matter. The testimony leads me to conclude that Davidson was not at fault in leaving the sea cock open.

By agreement of the parties, I am requested to pass upon the question of damages, as well as liability. There is to be a decree for the libelant upon the first item, namely, $25 for launching; also for labor performed from June 11 to June 16, 1909, inclusive, amounting in all to $65.77.

[2] 2. The libelant also asserts that at the request of the respondent he acted as watchman on said yacht for a period of 12 weeks, for

which the respondent agreed to pay him the sum of $2 a week. The respondent answers that this claim is not an admiralty or maritime cause of action, and is not within the jurisdiction of the court. In The George T. Kemp, 2 Low. 477, Fed. Cas. No. 5,341, Judge John Lowell held the services of a shipkeeper or watchman to be maritime services. This court has already considered the subject in The James T. Furber (D. C.) 157 Fed. 124. I have no question but that the services of watchman are maritime services. For them I allow the sum of $24.

[3] 3. The respondent says that the jurisdiction of the court does not extend to the storage of the boats belonging to the yacht. I have no question but that these are services which properly concern the conduct and management of a vessel and her owners, and that they are maritime services. In Benedict's Admiralty (4th Ed.) § 205, the text-writer says:

"Of the same nature (maritime) is the charge for storing the sails, or other furniture, in a storehouse on shore, and that kind of rent or storage is also the subject of a maritime action."

It is true that in Hubbard v. Roach (C. C.) 2 Fed. 393, in the Northern District of Illinois, Judge Dyer held:

"The storage of sails, when stripped from the vessel, is not a service pertaining to her navigation, and a claim for such storage is not a subject of admiralty jurisdiction."

But in The Gilbert Knapp (D. C.) 37 Fed. 209, 211, in the same district, Judge Jenkins said:

"Hubbard v. Roach, and The Ole Oleson [(C. C.) 20 Fed. 384], were ruled by my learned predecessor contrary to his own convictions, as he declares in the last-named case, and in obedience to supposed weight of authority."

In Roberts v. Bark Windermere (D. C.) 2 Fed. 722, 730, in the Southern District of New York, Judge Choate said:

"My attention has been called to a decision of Judge Dyer that the storage of the sails of a vessel on the land is not a maritime service, for which a suit in the admiralty will lie. He comments on, and disapproves of, the opinion of Mr. Benedict, cited above from his work on Admiralty, to the effect that the stevedore's service is maritime; and also his opinion that the storage of the sails is a maritime service.

"The authorities, however, which were cited in Hubbard v. Roach, and on which the decision is expressly put, very imperfectly represent the present state of this question; and for the reasons given above I am unable to concur in the reasoning of the learned judge so far as it affects the question now before this court."

In The George T. Kemp, Fed. Cas. No. 5,341, to which case I have briefly adverted, Judge Lowell referred to the case of The Amstel, Fed. Cas. No. 339, The Joseph Cunard, Fed. Cas. No. 7,535, and Weaver v. The S. G. Owens, Fed. Cas. No. 17,310. Judge Lowell cited also certain decisions touching this subject "after Judge Story's death, when the Supreme Court seemed bent upon narrowing the jurisdiction in all possible directions, by decisions, some of which have now been overruled and others explained to mean much less than they appeared to intend." In discussing this class of claims, Judge Lowell said:

"The notion that the maritime character of a contract for either labor or materials or of the remedy for furnishing them independently of contract

depends upon the situation of the vessel as being upon the high seas or in a dock reached its climax when it was held that a laborer who scraped the bottom of a foreign vessel preparatory to her being coppered had no lien; * * * and that the shipkeeper of a domestic vessel could not sue even in personam, in the admiralty. * * *

"If the services or contract properly concern the ship and her owners, they are clearly maritime, and can be sued against the owner of a domestic ship personally, or against the foreign ship in rem in this court. The cases in the Supreme Court are so recent that I do not cite them."

As early as 1833 Judge Ware passed upon this question in The Phebe, Fed. Cas. No. 11,065. The substance of his ruling remains law to-day. Upon the whole current of principle and authority, I must hold that the storing of tackle, apparel, and furniture of a yacht is as distinctly a maritime claim as the care of the yacht itself. I think the sum of $10 may be reasonably allowed for the storage of the yacht's boats in this case; and I include same in the decree. The decree may be for services under the contract and for labor performed, $65.77; for services as watchman, $24; storage of boats, $10; total, $99.77, to which may be added interest from April 5, 1910, the date of the filing of the libel, $13. A decree may be drawn for the libelant, therefore, for the sum of $112.77, with costs.

## No. 149.

[4] James F. Perkins, the owner and master of the steam tug Startle, brings this libel in his own behalf, and as agent for the engineer, and fireman of the steam tug, to recover salvage compensation for services rendered on June 19, 1909, by the steam tug Startle and her crew in pumping out the steam yacht Navis. Under rule 59, Joseph T. Davidson is made a respondent, upon the application of Charles A. Plummer, the claimant and owner of the yacht.

In case No. 150 I have already referred to the launching of the yacht Navis on the evening of June 16, 1909, when she was towed to her mooring on the South Portland side of Portland Harbor, about one-eighth of a mile above the Portland Ship Building Company's wharf, and abreast Davidson's yard. At the location of the mooring there were 30 feet of water at low water. After her launching, the testimony shows that she was under the care of the janitor of the Portland Yacht Club. On June 18th, about 5 o'clock in the afternoon, Davidson saw the Navis lying low in the water. The next morning, June 19th, at 5 o'clock, he saw that she had settled lower in the water. He then went to the house of Capt. Perkins of the Startle, and asked him to go to the relief of the yacht with his steam tug. Capt. Perkins immediately crossed the harbor, went aboard his steam tug, and proceeded at once to the yacht, in the meantime getting his suction hose and syphon ready. He began pumping, and got the water pumped out about noon, when his engineer went down into the engine room of the yacht and found an open sea cock which he closed with a wrench. The fireman went ashore and procured wood and built a fire, in order to blow out the yacht's boiler, which in the meantime had been filled with fresh water, in order to prevent injury from salt water.

The master and engineer of the steam tug Wawenoc, lying on the morning of June 19th at the South Portland Railway Company's

wharf, testify as to the condition of the yacht Navis. These officers saw her about 4:30 in the morning. Their testimony shows that the yacht lay very low in the water; that they went up to her with their steam tug, and found her with a rank list to port, and with the water within four inches of the scuppers, on the port side. It was not thought prudent to tow her across the harbor. The Wawenoc left the Navis, because the steam tug was not equipped with a pump, and could not render any assistance. Her captain knew there were other boats in the harbor equipped for that business, and he thought those boats would reach her before she sunk. From the testimony I can have no doubt that, when the Startle reached the Navis about 6:15 on the morning of June 19th, the yacht was in a sinking condition. The water was coming into her through a 2½-inch intake pipe. There is certain testimony, also, that the water was coming in through the water-closet connection. The yacht had listed to port until her port scuppers were within four inches of the water. I am satisfied that her condition was such that, unless prompt assistance had been rendered, she would have sunk at her mooring in deep water. If she had sunk, there must have been great injury done to her woodwork; and, if raised, it could have been only at great expense. The courts have frequently passed upon the question of salvage where the services were rendered in harbors. In The Despatch (D. C.) 50 Fed. 611, in the Southern District of New York, Judge Brown recognizes the sound policy of tugs proceeding promptly to the scene of danger. In The Blackwall, 10 Wall. 1, 13 (19 L. Ed. 870), Judge Clifford said:

"Steam vessels are always considered as entitled to a liberal reward, not only because the service is usually rendered by a costly instrumentality, but because the service is in general rendered with greater promptitude and is of a more effectual character."

In the case before me, the service rendered by the salving vessel was not accompanied by danger; but the other elements in it rendered it a salvage service of a deserving character. Clearly the element of promptness in it should be recognized. Other vessels were in the vicinity, and did not proceed to the assistance of the yacht. The Startle did proceed promptly, and rendered efficient service, by which, I am satisfied, the yacht was saved from sinking, and the owner from great expense. The value of the yacht appears to have been about $2,600. A bill for salvage was sent by Capt. Perkins to Mr. Plummer amounting to the sum of $300. Upon the whole, I think this is a little higher than I am inclined to regard the value of the salvage services. I do, however, fix the award at $250.

For the reasons given in commenting upon the former case, No. 150, I am satisfied that Joseph T. Davidson was not in fault, and should not have been joined as a respondent; and as to him the libel should be dismissed, with costs.

A decree may be entered for the libelant for the sum of $250. It may be distributed as follows: To the tug, $125; to the captain, James F. Perkins, $75; to George B. Perkins, the engineer, $35; to Charles J. McIntyre, the fireman, $15.

The libelant recovers his costs.