53 F.2d 672 (1931)
THE ARTEMIS.
THE WASTEENA.
ROBERT JACOB, Inc.,
v.
IRVING TRUST CO. (two cases).
RATSEY & LAPTHORN, Inc.,
v.
SAME.
S. APPEL & CO.
v.
SAME.
District Court, S. D. New York.
November 20, 1931.
*673 David Carll, of New Rochelle, N. Y., for libelants Robert Jacob, Inc., and Ratsey & Lapthorn, Inc.
Henry W. Baird, of New York City, for libelant S. Appel & Co.
Winthrop, Stimson, Putnam & Roberts, of New York City (William C. Chanler, Henry L. Steitz, and Robert G. Wilson, all of New York City, of counsel), for Irving Trust Co.
Davisson & Manice, of New York City (Preston Lockwood, of New York City, of counsel), for record owner of yachts.
WOOLSEY, District Judge.
The exceptions filed in these causes are in all respects overruled, and the report of the Commissioner is confirmed and approved.
I. The claimants in the above causes have filed exceptions to the Commissioner's report on the ground that the items for storage and locker space allowed by the Commissioner as maritime liens under section 30, subsec. P, of the Merchant Marine Act of June 5, 1920 (46 USCA § 971), are not properly maritime liens, within the scope of that act.
II. The report of the Commissioner, Russell T. Mount, Esq., dated August 17, 1931, is as follows:
"To the Honorable the Judges of the United States District Court for the Southern District of New York:
"In pursuance of orders of this Court entered in all four libels above entitled on June 17, 1931, whereby the said four causes were referred to the undersigned as commissioner `to hear and report on the merits and to ascertain the damages and the amount of the maritime liens, if any, with all convenient speed', I beg leave to make the following report:
"By leave granted by this Court, three of the above entitled libels were filed in rem against the Yacht Artemis, and the fourth in rem against the Yacht Wasteena, to enforce maritime liens for repairs, supplies and other necessaries.
"The libel of Robert Jacob, Inc., a New York corporation, against the Artemis is for $4,240.05, for work done and supplies and repairs furnished by the libelant, a shipbuilder and repairer at City Island in the Port of New York, to the Artemis between September 2, 1930, and May 1, 1931, including the dismantling of the yacht, hauling her out of water by use of a marine railway, scraping, cementing and painting her bottom, sliding her off the marine railway on land and storing her for the winter, including the storing of her mast, spars, equipment and small boats. The libel also sets forth as a separate cause of action an account stated for the same services and in the same amount. The libel alleges that the work, labor, services and repairs were necessary and proper for the yacht and constitute a lien against her by the maritime law and by the statutes of the United States. Interest is claimed from May 1, 1931.
"The libel of Robert Jacob, Inc., against the Motor Yacht Wasteena is filed to recover the sum of $451.31 for work, labor and services performed by the libelant at its shipyard at City Island between September 19, 1930 and April 24, 1931, in connection with repairs made to the yacht, including the hauling of the yacht out of water, furnishing the use of a marine railway for that purpose, sliding the yacht from the marine railway on shore and there storing her for the winter, including the rental of a canvas cover for the yacht, and the storage of her batteries. A second cause of action in this libel is for an account stated covering the same services and in the same amount. The libel alleges that the work, labor and services were necessary for the yacht and constitute a lien against her by the maritime law and the statutes of the United States. Interest is claimed from April 24, 1931.
"The libel of Ratsey & Lapthorn, Inc., a New York corporation, against the yacht Artemis is filed to recover $1,095.87 for work, labor and services performed by the libelant, a sailmaker, at City Island, between September 6, 1930 and March 31, 1931, in remaking, repairing and cleaning the sails and storing them for the winter layup of the yacht. A second cause of action is for an account stated for the same services and in the same amount. The libel alleges that the libelant is entitled to a maritime lien against the yacht for the said services both by the maritime law *674 and the statutes of the United States. Interest is claimed from March 31, 1931.
"The libel of S. Appel & Company against the Artemis is brought by a co-partnership carrying on business at No. 18 Fulton Street, New York, as suppliers of uniforms, and alleges that at New York between August 13, and 28, 1930, inclusive, the libelant at the instance and request of the owner, master or agent of the yacht sold and delivered to the said yacht at New York certain uniforms, clothing, outfittings and other equipment for the crew of the yacht, of the agreed price and reasonable value of $589.75. The libel also alleges an account stated for the same supplies and in the same amount. It further alleges that the supplies were necessary for the yacht and constitute a lien under the maritime law and the statutes of the United States.
"In each case the answer of the claimant, Irving Trust Company as Receiver, admits on information and belief that the allegations as to the work, labor, services and supplies are substantially true as alleged, but demands proof thereof, and denies that the libelant has a lien against the vessel by either the maritime law or the statutes of the United States.
"The Artemis and the Wasteena are both at present at the shipyard of Robert Jacob, Inc., under attachment of the marshal under process in these libels."

The Facts.
"The Auxiliary Yacht Artemis is a steel sloop about 120 feet over all, about 90 feet at the water line and draws about 15 feet. She is a racing yacht with a single stick mast 155 feet high. She has a crew of fifteen, including the master. In the fall of 1930 she was owned by Mr. William F. Ingold, against whom, as a partner of Pynchon & Co., certain bankruptcy proceedings are pending in this Court. In September, 1930, she arrived at the shipyard of Robert Jacob, Inc., at City Island. While she was still in the water certain work was done on her by the shipyard. Her sails were taken down and her spars and mast removed. She was then hauled out by the shipyard on a marine railway, where in accordance with an order given by her master on the basis of a written estimate furnished by the shipyard on October 21, 1930 (Libelant's Exhibit 2) her bottom was scraped, cemented, leaded and painted at an agreed cost of $1050. This work was necessary because when she was hauled out it was found that her bottom was in bad shape on account of her having been in the water all summer. It is customary and necessary in the case of a steel yacht to do this work each year to keep the bottom from rusting and pitting. After the repairing and painting of the bottom she was launched from the marine railway on to the land and was there shored up in her `winter berth' for the winter.
"According to the master a `lot of work' was done on her mast which with her spars was then covered and put in storage. If this work had not been done, a new mast would have been required in the spring, at a cost of $11,000.
"Her small boats, including dingies and a motor launch, were hauled out of water and put under a shed. Her furnishings and apparel (exclusive of her sails) such as glassware, rigging, tackle and other equipment, were stored by the shipyard in a watertight ventilated locker.
"At the request of the master, the ignition batteries belonging to the yacht, and used for running the electric lights and all other electrical apparatus on board the yacht were stored by the shipyard in its battery room. The smaller batteries belonging to the yacht's launch were also removed from the launch and likewise stored in the shipyard's battery room. This service was primarily a preservation of the batteries by charging them at regular intervals during each month of storage to keep them alive. If they had not been stored they would have gone dead and depreciated so that, as the master of the yacht testified, it would have cost from $1,000 to $1,500 for new batteries in the spring for the yacht alone.
"The necessity of all the services claimed in the libel of Robert Jacob, Inc. against the Artemis, the actual performance of the work as claimed in the bills and the reasonableness of the prices charged are established by the testimony of the president and general manager, the vice-president and assistant manager, the man in charge of the stock room and the accountant and time keeper. The master of the yacht, called by the libelant as a witness, also testified that all of the work represented by the bills had been done either on his order or on the order of the owner, that the prices charged were fair and reasonable, that the bill for scraping and painting the yacht's bottom, $1050, was the amount agreed on and approved by him before that particular part of the work was done; that he had approved all of the bills; and that all of the work done was necessary to make the yacht *675 seaworthy and preserve her in a seaworthy condition.
"In the libel of Ratsey & Lapthorn, Inc., the sailmaker, against the Artemis, the evidences established that all orders for work done were given to the libelant by the master of the Artemis; that the yacht is a racing yacht, fully equipped with racing sails; that in accordance with the master's order these sails were remade, repaired and washed and on October 20, 1930, stored at the libelant's plant in a specially constructed fireproof vault which is ventilated, so as to be heated in winter and cool in summer with a constant dry temperature. Mr. Ratsey, president of the libelant, testified that the yacht's sails which are very expensive, the cost of the mainsail alone being $7500, cannot be left on board during the winter layup, as they would in such case be eaten by rats and destroyed by mildew; that it is customary to store the sails of such yachts and that his company has at present in storage the sails of three of the cup race yachts. The Artemis' sails are still in storage in the libelant's vault.
"Capt. Crawford, master of the yacht, testified that he ordered the work done on the sails, which included shortening of the mainsail, scrubbing the sails and the sail covers and storing the same for the winter; that it is not safe to allow the sails to remain on board the vessel during the winter, and that all of the work done was necessary and proper. The actual performance of all the work appearing in the libelant's bills is established by the testimony of the libelant's president, its bookkeeper and its foreman in charge of the work, who kept the time of the men and materials employed. The reasonableness of the charges is established not merely by the testimony of the president of the libelant, but by the admission of the master of the yacht.
"In the libel of Robert Jacob, Inc., against the Wasteena, it appears that that smaller yacht is 48 feet in length, having a speed of 27 knots an hour. She also had certain repairs made to her on the order of Capt. Crawford, who was her master, beginning September 2, 1930, and then about the 1st of October, she was hauled out of the water on a marine railway and was then slid off from the marine railway on to the shore, and was propped up for winter storage on land and a canvas cover provided by the shipyard was placed over her. Her batteries were removed and put in the shipyard's battery room, and were charged as needed through the winter in order to keep them from going dead. The work done on her was on the order of the master, and the arrangement for her winter storage was by verbal agreement between the libelant and her owner.
"The reasonableness of the charges against the Wasteena are established by the testimony of the same witnesses who testified in the libel of Robert Jacob, Inc., against the Artemis, and the master who was called as a witness for the libelant, admitted that the work represented by the bills had been done; that the charges were reasonable and proper and had been approved by him; that he had ordered the work done, including the order for the winter cover for the Wasteena, and that the materials and services were necessary to keep her seaworthy.
"In the libel of S. Appel & Company against the Artemis, Captain Crawford, master of the yacht, was the only witness called. He testified that during the season of 1930 the yacht had a crew of 14 in addition to himself as master; that on account of changes in personnel of the crew it was necessary to buy additional outfits of clothing for certain members of the crew and that in August, 1930, he had ordered from the libelant in New York City all of the clothing, boots, shoes, etc. which are itemized in the libelant's bill dated September 2, 1930 (Libelant's Exhibit 1); that they were all delivered on board the yacht and that the charges, totaling $589.75 are reasonable and proper; and that at the time these goods were supplied to the yacht they were necessary for the yacht, in order that the crew might present a proper appearance. He also testified that it is the custom of all yachts for the owner to supply the master, officers and crew with uniforms and clothing. These supplies were ordered and furnished in August in order to outfit the crew immediately before leaving on a cruise to Bar Harbor. The outfitting consisted not merely of dress uniforms but also working clothes for working aboard the yacht. It was also admitted that the itemized bill had been rendered to the owner in due course, that no objections had been made by him to it and that no part of the bill had been paid.
"In all of the above libels, the testimony shows that the work, labor, services and materials were all supplied to the vessels in question on the order of the owner or the master, that the prices charged were reasonable and proper and were approved by the master; that they were all necessary for making the vessels seaworthy and preserving the vessels and their appliances through the winter layup; and that duplicate bills had been sent to both the master and the owner and that no *676 objection had been made by either master or owner to the bills as rendered."

Legal Conclusions.
"From the testimony above referred to, the facts in each libel in my opinion establish an account stated in an admiralty claim. The Hattie Thomas (1920 C. C. A. 2) 262 F. 943.
"Both on this ground, and on the ground of the testimony as to the actual work done and materials furnished on the orders of the master or owner and approved by the master, there is the following amount due to the libelant in each case:
"1. In the libel of Robert Jacob, Inc. against the Artemis, $4,240.05, with interest as claimed from May 1, 1931.
"2. In the libel of Robert Jacob, Inc. against the Wasteena, $451.31, with interest as claimed from April 24, 1931.
"3. In the libel of Ratsey & Lapthorn, Inc. against the Artemis $1,095.87, with interest as claimed from March 31, 1931.
"4. In the libel of S. Appel & Company against the Artemis, $589.75, with interest from September 2, 1930."

The Question of Maritime Liens.
"Inasmuch as the repairs, supplies and services were furnished in the vessel's home port, there is no lien under the General Maritime Law of the United States, apart from the Federal Maritime Lien Statute of June 5, 1920.
"The claimant argues that the following items do not constitute maritime liens under the Federal Statute. In the libel of Robert Jacob, Inc. against the Artemis:

 Expenses of taxicab September 26,
 1930, for conveying provisions to
 the Artemis for the use of her crew,
 which were dispatched with the
 steward on the steward's order from
 City Island to the Artemis lying at
 Greenwich ................................ $ 10.00
 Locker space from August 1 to October
 1, 1930, which covered the
 locker in the libelant's shipyard in
 which certain equipment of the
 yacht was stored ......................... 30.00
 Locker space from October 1 to December
 31, 1930, covering the same
 locker and the same services ............. 30.00
 Locker space from January 1 to May
 1, 1931 .................................. 40.00
 3 months' storage of 20-6 volt B-6
 Edison batteries, being the ignition
 batteries belonging to the yacht ......... 90.00
 4 months' storage on 20-6 volt B-6
 Edison batteries ......................... 120.00
 2 1/3 months' storage of 3-6 volt batteries,
 being the storage of the batteries
 from the yacht's launch .................. 7.00
 4 months' storage 3-6 volt batteries
 from the yacht's launch .................. 12.00
 First half winter storage of the Artemis
 which included hauling her out
 of the water on the marine railway,
 sliding her off on land and
 shoring her up in her `winter
 berth' ................................... 375.00
 Second half of the winter storage, to
 include putting her into the water
 in the spring ............................ 375.00

"In the libel of Robert Jacob, Inc., against the Wasteena:

 First half winter storage including
 hauling out and rental of canvas
 cover ............................... $ 80.00
 Second half of winter storage including
 cover rental, and putting Wasteena
 in the water again in the
 spring .............................. 80.00
 7 months' storage of 3-6 volt batteries
 belonging to the Wasteena ........... 21.00

"In the libel of Ratsey & Lapthorn, Inc. against the Artemis:

 For storing sails from October 20,
 1930, to March 31, 1931, 5 months
 at $15 per month ................ $ 75.00

"With respect to the item of $10.00 for taxicab charges, similar charges were held to be maritime liens in The Egeria (1923 C. C. A. 9) 294 F. 791, 794, and The Ascutney (1922 D. C. D. Md.) 278 F. 991, 992.
"With respect to the items for storing the yacht's equipment, sails and small boats, the testimony is clear that such storage was necessary to preserve them during the winter. In the storage of the batteries of both the Artemis and the Wasteena, the service involved a recharging of those batteries at regular intervals to save them from deterioration. If the sails had not been washed and stored in the ventilated vault, they would have required complete renewal in the spring at great cost, which cost would have created a lien against the yacht.
"In opposing the items of storage as maritime liens, the claimant refers to certain cases which have held that the Federal Maritime Lien Act should be strictly construed. The cases cited by the claimant, however, dealt with the earlier act of 1910. The Federal Maritime Lien Act of June 23, 1910, provided *677 in section 1 (46 USCA § 971 note) as follows:
"`Any person furnishing repairs, supplies, or other necessaries, including the use of dry dock or marine railway, to a vessel, whether foreign or domestic, upon the order of the owner or owners of such vessel, or of a person by him or them authorized, shall have a maritime lien on the vessel which may be enforced by a proceeding in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.'
"It should be noted that in that statute the words `or other necessaries' follow immediately after the two categories `repairs, supplies,' and under that statute it was held that the words `other necessaries' must be limited to matters ejusdem generis with repairs and supplies.
"In The J. Doherty (1913 D. C. S. D. N. Y.) 207 F. 997, the Court held that on the principle of ejusdem generis, towage was not a necessary within the meaning of that statute.
"Following that case came the decision in The Hatteras (1918 C. C. A. 2) 255 F. 518, in which the Circuit Court of Appeals for the Second Circuit, without discussion of the question, adopted as its own the holding of the District Court in The J. Doherty, that towage was not included within the meaning of `other necessaries' under the Act of 1910.
"Then came the decision in The Andrew J. Smith (1920 D. C. E. D. N. Y.) 263 F. 1004, in which it was held that wharfage as such does not come within the meaning of `other necessaries' under the Act of June 23, 1910. It is interesting to note that the same case held that wharfage furnished to a vessel undergoing repairs becomes part of the charge for repairs and is included in the lien for repairs under the statute.
"Following the above decisions came The Muskegon (1921 D. C. S. D. N. Y.) 275 F. 117, in which it was held that the services of a master stevedore did not constitute a lien within the meaning of the Maritime Lien Act of 1910, because they were not `necessaries' under that Act, not being ejusdem generis with repairs and supplies. The case is based on the holding in The J. Doherty and The Hatteras. Learned Hand, D. J., said at page 118 of 275 F.:
"`This being, for the present, anyway, the fixed law, it seems to me clear that the master stevedore's lien is in the same class as towage, and that in this circuit the act of 1910 includes neither, whatever may be the rule in the Fifth or the Ninth. The reason why the act has been thought to exclude towage is that the word `necessaries' is to be read ejusdem generis, and includes only the outfitting of the ship, as opposed to her carriage of freight. For this reason the statute did not affect all maritime liens, but only those which were related in kind to repairs and supplies, except as specifically added. But stowage is as little akin to repairs and supplies as towage. Each is a part of the earning of freight; properly each is a part of the carriage, for the ship must lift her cargo before she can carry it. Hence, if towage is not ejusdem generis with repairs and supplies, I can see no rational distinction between it and stowage or discharge. It must result, therefore, that liens for these remain as they were, unaffected by the act of 1910, and that there was no lien here, since the ship was in her home port.' (Italics ours.)
"The Muskegon was affirmed (1921 C. C. A. 2) 275 F. 348, on the authority of the same Court's decision in The Hatteras, and the District Court's decision in The J. Doherty, the Court saying at page 350 of 275 F.:
"`Other necessaries' mean matters ejusdem generis with repairs and supplies, and that the charge of a master stevedore does not belong to that class is we think entirely plain.
"`To the full enjoyment and profitable occupation of a ship there are many services which are convenient, useful, and at times necessary; stevedoring is one of them, but it cannot be promoted into that class of claims, long described as "repairs and supplies" by force of the statute, unless the statute be deemed as intended to create a maritime lien in the home port for everything that gives a maritime lien abroad.
"`No such intention can be discovered in the language of the act nor from the history thereof.'
"The next decision apparently was The Mona (1922 C. C. A. 4) 282 F. 468, which expressly followed The Hatteras, and held that towage was not included within the meaning of `other necessaries' under the Act of June 23, 1910.
"In 1920, however, Congress amended the Act of June 23, 1910, by adding `towage,' and changing the position of the words `and other necessaries' so that the amended statute which is now section 30, subsec. P of the Merchant Marine Act of June 5, 1920 (46 USCA § 971), reads as follows: `Any person furnishing repairs, supplies, towage, use of dry dock or marine railway, or other necessaries, *678 to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner, shall have a maritime lien on the vessel, which may be enforced by suit in rem, and it shall not be necessary to allege or prove that credit was given to the vessel.'
"Following this amendment, the courts have held that the words `other necessaries' now have a meaning more extended than the same words as used in the Act of June 23, 1910. This enlargement of meaning is discussed in Re Burton Steamship Co. (1925 D. C. D. Mass.) 3 F.(2d) 1015, where the court held that the use of the Cape Cod Canal was a `necessary' for a vessel within the `broadened' scope of the act of 1920, saying at page 1016: `In my opinion the act of 1920 was passed by Congress to give a more extended scope to the original act. I am therefore of the opinion that the charges for the use of the canal gave rise to a lien on the steamship Carisco.'
"In The Henry S. Grove (1922 D. C. W. D. Wash.) 285 F. 60, that court had also pointed out that the scope of the 1920 statute was broadened beyond the scope of the 1910 statute, saying at page 61: `It must be noted that the present law, by expressly adding "towage" as a lienable service, and including the service of a "dry dock or marine railway" in that part of the act preceding the expression of "or other necessaries" has, by so doing, broadened the scope of the latter expression.'
"The court held that the work of a master stevedore is included in the words `other necessaries' under the Act of 1920.
"In The Suelco (1922 D. C. E. D. N. Y.) 286 F. 286, it was stated that wharfage was not included in `other necessaries' under the law of 1920; but the statement was based on decisions which had involved the earlier act of 1910, and the case was in fact decided on the ground that the claim was based on the lease of a pier and not on true wharfage for the single vessel involved in the suit.
"In United States v. Certain Subfreights due S. S. Neponset (1924 D. C. D. Mass.) 300 F. 981, it was held that the scope of the 1920 statute was enlarged beyond the scope of the 1910 statute, and that, following the Henry S. Grove, a master stevedore is given a lien for his services under the Act of 1920.
"In The Egeria (1923 C. C. A. 9) 294 F. 791, where the intervenor in a ship mortgage foreclosure libel had advanced money to release the vessel from a seaman's wage libel and for the expenses of bringing her back to her home port, it was held that the intervenor had a lien for his advances under the 1920 statute, although the items of his claim included interest paid by him on a loan which he obtained in order to get the money needed to make the advances, and also expenses for telegrams and traveling. The Court said at page 794: `The appellants contend that none of the items included in the lien of the appellee Mason, saving and except $6,600 which he paid for the release of the ship at San Pedro, are lienable. Objection is made especially to the item of interest paid upon the note to the United States Bank, $45.20, and the expenses for telegrams and traveling expenses. The statute of 1920, 41 Stats. 1005 (Comp. St. Ann. Supp. 1923, § 8146¼ ooo [46 USCA § 971]), confers a lien upon "any person furnishing repairs, supplies, towage, use of drydock or marine railway, or any other necessaries, to any vessel, whether foreign or domestic, upon the order of the owner of such vessel, or of a person authorized by the owner." There was proof that all the expenditures included in the lien awarded to Mason were made on behalf of the ship and were necessary to preserve and protect it. Mason was obliged to travel from Portland to San Pedro, and, in addition to the $6,600 paid to release the vessel, he necessarily incurred incidental items of expense. There was no attempt to deny his testimony that the expenditures were necessary. The item of interest was paid on a note for $7,500 which Mason executed in order to borrow the money to release the ship. In The Ascutney (D. C.) 278 F. 991, a lien was allowed for items such as taxi bills and expenditures for telephone, telegrams, and postage. We think that Mason is entitled to a lien for all of the sums allowed him by the court below.'
"In The Susquehanna (1923 D. C. D. Mass.) 3 F.(2d) 1014, on arrival of the vessel at Boston, the port surgeon of the United States Public Health Service refused to allow the steamer to dock until all passengers' baggage on board had been fumigated, and ordered such fumigation to be done. The agent of the company operating the vessel under a charter sales agreement from the Shipping Board contracted with the libelant for this fumigation. The baggage was brought to the libelant's plant, where it was fumigated. It was afterwards returned to the steamer and delivered at the dock to which she had gone. Without the fumigation she would not have been permitted to discharge her passengers and their baggage. The Court *679 held that these fumigation services, although concededly performed on land, created a lien against the vessel under the Act of 1920. The libel was dismissed on the ground that the libelant could have ascertained by due diligence that because of the terms of the charter sales agreement with the owner, the operator was not authorized to create a lien against the vessel, but the Court said at page 1015: `In view of the decisions above referred to and of the principles of law on which they rest, it seems to me that the services performed by the libelant were of such character as to give rise to a maritime lien against the steamer, both under the general admiralty law and, as "necessaries," under the Maritime Lien Act of 1910 (36 Stat. 604 [U. S. Comp. Stat. 1916, § 7783 et seq.]) and the Merchant Marine Act of 1920 (41 Stat. 988 [Comp. St. Ann. Supp. 1923, §§ 8146¼-8146¼t]).'
"It is thus clear that the restrictive meaning of `other necessaries' under the Act of 1910 has been enlarged by the wording of the Act of 1920, so that those words now cover not merely material things, but also `services' which are necessary for the operation or the preservation of the vessel.
"In The Gustavia (1830 D. C. S. D. N. Y.) Fed. Cas. No. 5,876, 1 Blatch. & H. 189, a libel by ship's broker against a foreign vessel for services, Betts, J., said at page 191: `By the term "necessaries," the law does not contemplate those things only which are indispensable to the safety of the vessel and her crew. But, whatever a prudent owner, if present, would be supposed to have authorized, the master may order, and the vessel will be held responsible for them. Webster v. Seekamp, 4 Barn. & Ald. 352.'
"In The J. Doherty (1913 D. C. S. D. N. Y.) 207 F. 997, Judge Veeder had said at page 1000: `In the broad sense of the term everything is necessary for a ship which tends to facilitate her use as such or to save her from danger.'
"It is clear that if the so-called `storage' services had not been rendered in this case there would have resulted in consequence an absolute necessity for the expenditure of large sums of money at least in renewing sails and batteries, which expenses would have beyond question constituted maritime liens against the two yachts under the act of 1920. In the light of these facts, and in view of the decisions analyzed above, it is to my mind established that the items of so-called `storage' of the vessels' equipment, sails and batteries, come within the enlarged meaning of `other necessaries' under the Act of 1920.
"That such services are maritime was decided in The Navis (1912 D. C. D. Maine) 196 F. 843, in which case Judge Hale, after reviewing the statements appearing in earlier cases held that the charges for storage of a yacht's small boats are within the admiralty jurisdiction, saying at page 847: `Upon the whole current of principle and authority, I must hold that the storing of tackle, apparel, and furniture of a yacht is as distinctly a maritime claim as the care of the yacht itself.'
"To the same effect is the statement in Benedict on Admiralty (5th Ed.) page 169: `Of the same nature is the charge for storing the sails or other furniture in a storehouse on shore and such storage is also the subject of a maritime action.'
"A fortiori, the charges for so-called `storage' of the Artemis and the Wasteena would seem to be `necessaries' under the Act of 1920. In the case of the Artemis there was a flat price of $750 agreed on with the owner for laying the yacht up and launching her again in the spring. Of this amount $375 was billed for laying her up, those services including, of course, hauling the vessel out of the water on marine railway, and sliding her from the marine railway to a winter berth on shore. Of that $375 the value of the services for hauling her out of the water was $150 and the value of the services for building ways under her and sliding her from the marine railway to her cradle was $100. The value of the services for sliding her off the cradle to the marine railway and then launching her was $150. The president of the shipyard testified that the charge for storage was merely a nominal charge the real services being the hauling out of water and again launching the vessel, the libelant counting for its profit on doing work on the vessel in the spring. The total charge of $750 to the Artemis also included the storage of her mast and small boats.
"In the case of the Wasteena the testimony of the president of the shipyard was that, of the $80 charge for the first half of winter storage, the hauling of the yacht out was worth $70 or $75; that, of the $80 charge for the second half of the winter storage, the value of putting the yacht back into the water was $50, and that the reasonable value for furnishing the canvas cover for the Wasteena during the winter storage was $30 to $35. In the case of the Wasteena it would, *680 therefore, seem evident that the actual storage on the land was gratis.
"The incidental service of `storage' on land would seem to be identified with the concededly maritime services of hauling the vessel out and putting her back into the water. In The Andrew J. Smith (1920 D. C. E. D. N. Y.) 263 F. 1004, and in The Geisha (1912 D. C. D. Mass.) 200 F. 865, 869, it was held that although wharfage as such would not constitute a maritime lien, nevertheless where the wharfage was part of the repairs, it became identified with the repairs and was included in the maritime lien.
"That the services were performed on land, would not make them non-maritime. The Susquehanna (1923 D. C. D. Mass.) 3 F.(2d) 1014, involving fumigation of baggage on shore; The Egeria (1923 C. C. A. 9) 294 F. 791, involving shore traveling expenses and telegrams; The Ascutney (1922 D. C. D. Md.) 278 F. 991, involving shore expenses of a ship's agent; The Geisha (1912 D. C. D. Mass.) 200 F. 865, 872, involving the repairs made on land to seines carried by The Geisha's seine boat. In North Pacific S. S. Co. v. Hall Bros. Co. (1918) 249 U. S. 119, at page 128, 39 S. Ct. 221, 224, 63 L. Ed. 510, Mr. Justice Pitney delivering the opinion of the Court said: `There is no difference in character as to repairs made upon the hull of a vessel dependent upon whether they are made while she is afloat, while in drydock, or while hauled up by ways upon land. The nature of the service is identical in the several cases, and the admiralty jurisdiction extends to all.'
"In Wortman v. Griffith (1856 C. C. S. D. N. Y.) Fed. Cas. No. 18,057, Mr. Justice Nelson of the United States Supreme Court, sitting on Circuit held that a per diem charge by the owner of a shipyard for the use of the ways on land in the shipyard, although the repairs to the vessel on the ways were being made by third parties, constituted a claim within the admiralty jurisdiction. I think the reasoning of that opinion applies to the `storage' charge on the Artemis.
"In The Navis (1912 D. C. D. Maine) 196 F. 843, a libel in personam, the unpaid last half of a lump sum charge for winter storage of a yacht, which of course included the spring launching, was expressly awarded to the libelant shipyard owner.
"In view of the fact, therefore, that the services of hauling the yachts out of the water, taking care of them through the winter and launching them in the spring, are maritime, and that they are clearly necessary for the preservation of the vessels, it would in my opinion follow that those services give rise to a lien under the Act of 1920.
"As the Artemis and the Wasteena are still on land at the shipyard, awaiting launching, the lien for those services should in my opinion be reduced in the case of the Artemis by $150, the value of her future launching and in the case of the Wasteena by $50, the value of her future launching.
"With respect to the libel of S. Appel & Company against the Artemis for uniforms, it would seem clear that the claim is one for `necessaries' under the Act of 1920. In The Fortuna (1914 D. C. W. D. Wash.) 213 F. 284, it was held that charges for clothing, hats, boots, gloves, blankets, etc. supplied for the crew of a fishing vessel were `necessaries', giving rise to a lien under the Act of 1910.
"I therefore beg to report that in my opinion the libelants are entitled to maritime liens as follows:
"1. In the libel of Robert Jacob, Inc., against the Artemis, $4,090.05, with interest as claimed from May 1, 1931.
"2. In the libel of Robert Jacob, Inc., against the Wasteena, $401.31, with interest as claimed from April 24, 1931.
"3. In the libel of Ratsey & Lapthorn, Inc. against the Artemis, $1,095.87, with interest as claimed from March 31, 1931.
"4. In the libel of S. Appel & Company against the Artemis, $589.75, with interest from September 2, 1930."
III. I have nothing to criticise in, and nothing to add to, Mr. Mount's admirable report, which is hereby adopted by me as the opinion of the Court.
Orders, accordingly, may be submitted making it the findings of fact and conclusions of law of this court in these causes.
IV. These libels are ancillary to a proceeding in bankruptcy entitled In the Matter of Pynchon & Co., Bankruptcy No. 51,159, and were filed by permission of the Bankruptcy Court. The Bankruptcy Court, consequently, as the dominant jurisdiction, has control of these proceedings in admiralty, Isaacs, etc., v. Hobbs Tie & Timber Co., 282 U. S. 734, 737, 51 S. Ct. 270, 75 L. Ed. 645; In re Schulte United (C. C. A.) 49 F. (2d) 264; In re Giuseppa Parrino, 50 F.(2d) 611, decided May 23, 1931, in the Eastern district of New York, by Judge Campbell; In re Morris White Holding Co. (D. C.) 52 F.(2d) 499, 500, and the final decrees to be entered in them must not contain any provision for *681 immediate sale of the vessels libeled, but must provide instead that, before any writs of venditioni exponas are issued, the libelants must get permission from the Bankruptcy Court by application made in the proceeding there pending entitled In the Matter of Pynchon & Co., Bankruptcy No. 51,159, in which the claimant in these causes is the receiver, and, as such, the lawful custodian of these vessels.
Unless agreed in form, the orders and decrees are to be settled on two days' notice.