**AMERICAN STEAMSHIP COMPANY, Libelant-Appellant (Cross-Appellee),**

v.

**The GREAT LAKES TOWING COMPANY, Respondent-Appellee (Cross-Appellant).**

**Nos. 14350, 14351.**

United States Court of Appeals Seventh Circuit.

May 22, 1964.

Rehearing Denied June 17, 1964.

Certiorari Denied Oct. 26, 1964. See 85 S.Ct. 160.

er, Milwaukee, Wis., Peters, McHie, Enslen & Hand, Hammond, Ind., of counsel, for Great Lakes Towing Co.

Before HASTINGS, Chief Judge, and CASTLE and KILEY, Circuit Judges.

KILEY, Circuit Judge.

The questions raised are whether the district court erred in deciding respondent tug company was solely liable for negligence in causing damages to libelant's steamer, the Detroit Edison, and whether the court erred in applying respondent's tariff to limit alleged damages of $91,044.20 to the sum of $1,837.-50. We hold the decision on liability was not erroneous, but that the court erred in deciding respondent's pertinent tariff provisions were valid and in limiting recovery accordingly.

The tug Montana, on May 23, 1961, was engaged by libelant to tow the Detroit Edison from a berth in the Indiana Harbor canal to Inland Steel Company's #4 dock in the Indiana Harbor Basin. Detroit Edison's own engines, aided by the Montana, moved her to the center of the canal. The Montana alone initiated the Detroit Edison's movement astern, working her starboard bow. She was pushed astern from the canal into the basin. The problem then was to move her 2,200 feet across the basin to the dock opposite the mouth of the canal. This required a turning (winding) maneuver of 90 degrees so that the Detroit Edison would be landed in her new berth parallel to the dock. Although the weather was good, the maneuver failed, Detroit Edison's rudder hit a wooden spile cluster near the concrete dock and was damaged.

The conclusion of negligence was based on ultimate fact findings that the tug Montana, in furnishing the sole motor power for the movement, gave the Detroit Edison "too much sternway," selected and indicated an unsafe course across the basin for approach to the #4 dock, and permitted the stern of the Detroit Edison to come too close to the dock before attempting to move her parallel for a landing.

---

Fenton F. Harrison, Buffalo, N. Y., Palmer C. Singleton, Jr., Hammond, Ind., Coffey, Heffernan & Harrison, Buffalo, N. Y., Fenton F. Harrison, Buffalo, N. Y., of counsel, for American Steamship Co.

Harney B. Stover, Jr., and Harney B. Stover, Milwaukee, Wis., Stover & Stover, Milwaukee, Wis., Peters, McHie, Enslen & Hand, Hammond, Ind., of counsel, for Great Lakes Towing Co.

There was testimony from which the district court could reasonably infer that the Montana's captain, who had knowledge of the basin and had undertaken the admittedly cooperative movement with one tug, negligently failed to begin the winding maneuver in time; that this negligence created an emergency in which the steamer's master, until then relying on the seamanship of the Montana's captain, to avoid collision ordered the steamer's engines ahead in gradual acceleration and signalled the Montana to bring the steamer's "bow up"; and that the Montana's response was too late to complete the maneuver safely.

■ Cross-examination of both the master and captain developed some inconsistencies and contrarieties, but these presented credibility judgments for the district court and not for us. There is substantial evidence to support the district court's findings and they are not clearly erroneous. We have considered the entire evidence and are not left with a definite and firm conviction that a mistake has been made. McAllister v. United States, 348 U.S. 19, 20, 75 S.Ct. 6, 99 L.Ed. 20 (1954), United States v. M/V Martin, 313 F.2d 851, 852 (7th Cir. 1963). The conclusion based on the findings is not erroneous.

■ Libelant contends that Articles 11 and 16 [1] of respondent's tariff are invalid as contrary to public policy. Article 16 purports to limit respondent's liability for damages to $1,000 in cases of asternway movement by one tug, and Article 11 purports to limit respondent's liability for demurrage during repairs to $100 a day. Escalation provisions are provided in each article so that if the tow gives respondent prior notice and pays an additional fee respondent's liability will be increased—$1,000 of additional liability for damages and $100 of additional demurrage for each additional fee increment of five per cent.

The limitation in Article 16 appeared first in 1956, and since its promulgation no customer had ever availed itself of the escalation provisions; nor had any

1. The relevant tariff provisions are as follows:

"11. The rates for service named herein are made upon the express condition that no claim for delay of any vessel served (whether due to repairs of damage or other causes), for which the Towing Company may be legally liable, shall in any case exceed One Hundred Dollars ($100.00) per calendar day of such delay. Upon written notice from the owner, charterer, or person having control of the vessel or vessels to be served to the Towing Company before the service is commenced, the above mentioned limit of liability upon demurrage claims may be increased, in which event the regular tariff rates will be increased five per cent of such rates for every One Hundred Dollars ($100.00) of increase in the limit of the Towing Company's liability for demurrage specified in such notice, but in no event shall such liability exceed the actual legal liability of the Towing Company for such demurrage. Nothing herein contained shall be construed to deprive the Towing Company of any legal defense it may have whether by limitation of its liability under the Statutes of the United States or otherwise.

\* \* \* \* \*

"16. When a self-propelled vessel under power is towed or pushed stern first by one tug at her bow or stern, or is being winded by one tug at her bow or stern, or when a tug or tugs are assisting any vessel in conjunction with a tug not owned or operated by the Towing Company, the liability of the Towing Company for damages arising out of the service shall not exceed One Thousand Dollars ($1,000.00). This amount may be increased by written notice to the Towing Company given by the owner, charterer, or person having control of the vessel or vessels to be served before the service is commenced, provided any rate as set forth in this tariff and as applicable to the service to be performed is increased in the amount of five per cent for every One Thousand Dollars ($1,000.00) that the Towing Company's liability is increased. Such amount shall constitute the total maximum liability of the Towing Company irrespective of the number of vessels served in the same service and irrespective of the number of claims asserted arising out of such service. Nothing herein contained shall be construed to deprive the Towing Company of any legal defense it may have whether on the merits or by limitation of its liability under Statutes of the United States or otherwise."

customer availed itself of the escalation provisions of Article 11. When the tariff was published, libelant took exception to Article 16, reserving its right to question the ultimate legal effect of the limitation. To avail itself of the escalation provisions related to the damages at issue in this case, even if they could be anticipated, libelant demonstrated that the tug charges for the tow would have been increased almost six times—to $1,798.03.[2]

In a number of recent admiralty cases the Supreme Court has laid down a strong policy against clauses attempting to release wrongdoers from the effects of their negligence. In Bisso v. Inland Waterways Corp., 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911 (May 16, 1955), the Court held, on public policy grounds, that a towage company cannot release itself by contract from all liability for its negligence causing damage to its tow. The same day the Court in Boston Metals Co. v. The Winding Gulf, 349 U.S. 122, 75 S.Ct. 649, 99 L.Ed. 933, struck down a clause in a towage contract which provided the master and crew of the tug would be servants of the tow and not responsible for negligent towage. And in April, 1963, the Supreme Court, *per curiam*, "adhered to the rule laid down in Bisso and Winding Gulf" and invalidated an indemnification clause in a towing contract reached after arm's length bargaining. Dixilyn Drilling Co. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78.

It is true that in Southwestern Sugar & Molasses Co. v. River Terminals Corp., 360 U.S. 411, 421, 79 S.Ct. 1210, 1217, 3 L.Ed.2d 1334 (1959), the Court stated:

"We hold that the Court of Appeals correctly ruled that the ex-

culpatory clause here at issue should not be struck down as a matter of law, and that the parties should be afforded a reasonable opportunity to obtain from the I. C. C., in an appropriate form of proceeding, a determination as to the particular circumstances of the tugboat industry which lend justification to this form of clause, if any there be, or which militate toward a rule wholly invalidating such provisions regardless of the fact that the carrier which seeks to invoke them is subject to prospective and retrospective rate regulation."

The Court refused "automatically to extend the rule of Bisso" to Southwestern Sugar because Bisso did not involve "a pervasive regulatory scheme." The tariff before us, as in Bisso, was not subject to regulation by public authority.[3] And Justice Harlan, who wrote the majority opinion in Southwestern Sugar, in a concurring opinion in the subsequent Dixilyn case stated that the "overriding consideration" of certainty in the kind of commercial transaction involved, "would not be promoted by opening the Bisso rule to indeterminate exceptions," where, unlike Southwestern Sugar, no functions of a regulatory agency are involved.

The district court in the case at bar thought that since Article 16 limited liability only "where there is asternway movement by one tug"—an "obviously * * * difficult and somewhat hazardous operation"—the limitation was not unreasonable "[u]nder such circumstances." That this holding is based on conclusions seemingly contrary to its findings [4] is immaterial, since it is our

2. The charges for the operation in question were $304.75. By the terms of Article 16, if two tugs had been employed in the maneuver, at a cost of $609.50, the limitation in that article would not be effective.

3. Respondent, though not a common carrier, has been put substantially on that basis through an anti-trust decree. United States v. Great Lakes Towing Co., 217 F.

656 (N.D.Ohio, 1914). It is not subject to the Interstate Commerce Commission, and its tariffs are under its own control subject only to the terms of the anti-trust decree.

4. The court found:
"16. The contemplated maneuver under weather conditions and daylight prevailing at the time of this disaster was not

opinion that the Supreme Court's reversal of the court of appeals in Dixilyn Drilling Co. v. Crescent Towing & Salvage Co., 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78 (1963), reversing 303 F.2d 237 (5th Cir. 1962), has effectually repudiated the Court's statement in Southwestern Sugar that "peculiar hazards" may not be bound by Bisso but may call for "development of * * * a particularized rule to deal with particularized circumstances." 360 U.S. at 419–420, 79 S.Ct. at 1216.

It is our opinion that the policy reasons underlying the Bisso decision—"(1) to discourage negligence by making wrongdoers pay damages, and (2) to protect those in need of goods or services from being overreached by others who have power to drive hard bargains," 349 U.S. at 91, 75 S.Ct. at 632 and the consideration of commercial certainty called for by Justice Harlan in Dixilyn control our decision, even though the tariff provisions before us limit, rather than exclude, liability.

Respondent was the negligent wrongdoer liable for payment of libelant's damages; and with its monopolistic position in the Great Lakes [5] it has the "power to drive hard bargains." Articles 11 and 16 must fall. An additional reason for invalidating Article 16 would be that there is no commercial "certainty" as the escalation provision has little meaning where the owner cannot anticipate the measure of damages to its vessel, and make a judgment about higher valuations and rates accordingly.

We have considered the reasons advanced by respondent for upholding the validity of Articles 11 and 16 but find them unavailing.

The court did not err in deciding respondent's negligence was the sole cause of the damages. It did err, however, in

deciding the tariff provisions in Articles 11 and 16 are valid. The judgment is vacated and the cause remanded for proof of damages unlimited by Articles 11 and 16 of respondent's tariff.

---

an unusual tug maneuver and is and was frequently performed by one tug assisting a steamer on her bow."

5. The court found:
"9. That the Great Lakes Towing Company has a virtual monopoly in the business of towing large bulk lake steamers for hire in all of the major United States port[s] of the Great Lakes except Green Bay-Manitowoc and Bay City-Saginaw."