**FIREMAN'S FUND AMERICAN INSURANCE COMPANY**

v.

**BOSTON HARBOR MARINA, INC.**

**Civ. A. No. 66-826-W.**

United States District Court
D. Massachusetts.

May 13, 1968.

Leo F. Glynn, Boston, Mass., for plaintiff.

Donald P. Weiners, Burke, Monaghan & McGrath, Boston, Mass., for defendant.

## OPINION

WYZANSKI, Chief Judge.

This case is here on "defendant's motion for summary judgment."

Complaint was filed by Feinberg, a Massachusetts citizen, the owner of the yacht NORUNA VI, against Boston Harbor Marina, Inc., a Massachusetts corporation. Claiming admiralty jurisdiction, the complaint alleges that plaintiff entered into a contract with defendant to store and make certain repairs on the yacht; that plaintiff delivered to defendant the yacht; that defendant broke its contract; and that the breach caused $9,500 damage, due to fire. Alternatively, the complaint alleges the defendant by its negligence caused the damage.

Defendant's answer admits that this Court has jurisdiction, that the parties entered into a boat storage contract, that plaintiff delivered to Boston Harbor Marina [that is the location, not the corporation] the yacht for storage and repairs, that there was a fire on defendant's premises on January 26, 1966, and that defendant "stored and was obligated to make certain repairs on the yacht." The answer sets forth four defenses: that plaintiff expressly assumed all of the risks associated with the storage, handling, and other work performed; that plaintiff agreed to carry insurance and to seek relief from any loss through said insurance; that the fire was caused by the act of a person of whom defendant had no knowledge or control; and that plaintiff was obliged under the contract to prepare his boat for storage in a manner that would not constitute a fire hazard, but plaintiff broke that condition, and that the breach caused or contributed to the fire which caused the damage of which he complains.

Without objection, September 25, 1967, the Court allowed plaintiff Feinberg's

motion to substitute as party plaintiff its insurer Fireman's Fund American Insurance Company, a California corporation.

Thereafter, on November 29, 1967, responding to interrogatories earlier propounded by the original plaintiff Feinberg, defendant answered that on January 26, 1966 the yacht was stored in building 15 "just inside the main door"; that in the previous November the engines of the yacht were "winterized"; that defendant had not ordered its chief mechanic "to pump the gas from the tanks of the NORUNA VI prior to January 26, 1966"; that "the gas would not be pumped from the tank unless a specific order was given by the owner"; that alcohol or anti-freeze is used in winterizing engines; and that the floor of the building where the NORUNA VI was housed on January 26, 1966 was constructed of concrete.

After it had been substituted as plaintiff for Feinberg, Fireman's Fund American Insurance Company on November 29, 1967 replied to defendant's interrogatories propounded to Feinberg on March 14, 1967. The answers state that Feinberg paid defendant $208 for it to "prepare surface and paint—bottom, boottop, topsides—winterize engines—pump out gas from tanks—install new tanks."

On November 9, 1967 there was taken, on behalf of plaintiff, the deposition of Lester B. Wilkins who was employed on January 26, 1966 by defendant in "trying to get current through to a boat for the using of drop lights and the panel." The boat he was working on was at one end of the hangar and the boats were lined up one behind the other. "The floor was wet." He was right beside the NORUNA. Some time before the fire, he had "winterized" the NORUNA "so that it won't freeze", she was winterized as far as lubrication but the gas tank was not drained. The NORUNA and other boats were all within the hangar; the NORUNA was about 20 feet from the only doors you could get boats through; all these boats are stored the same way, very close, so that the bulk of each boat was just put on top of each other.

December 28, 1967, defendant moved for summary judgment on the ground of the pleadings, an uncontradicted affidavit of Gordon A. Robins, and an undisputed written storage contract not changed by parol.

Robins' affidavit shows he is Assistant General Manager of defendant and refers to the printed contract, executed by defendant and Feinberg, the original plaintiff. That contract has *inter alia* the following provisions:

"REQUIRED ON ALL BOATS ACCEPTED FOR INSIDE STORAGE

It is agreed that the boat and all other property of the boat owner, his employees, servants, agents, and guests, which may be brought onto the BOSTON HARBOR MARINA, INC. premises, are during the term of this contract and any extensions thereof or such times as said property is held on the BOSTON HARBOR MARINA, INC. premises at the sole risk of the boat owner, his employees, servants, agents, and guests, and that BOSTON HARBOR MARINA, INC., its agents, servants and employees will not be liable for any loss of or damage to said property under any circumstances including, but not limited to fire, theft, vandalism, water damage and any negligent acts. or omissions and notwithstanding any asserted or actual breach of this contract by BOSTON HARBOR MARINA, INC.

Any boat placed in storage at BOSTON HARBOR MARINA, INC. under this contract shall be subject to the contract terms and conditions as set forth on the reverse side hereof to which both parties herein agree."

*   *   *   *   *   *

"CONTRACT TERMS AND CONDITIONS

The boat owner is well aware that the consideration paid to Boston Harbor Marina, Inc. for the storage of his boat is disproportionately small in com-

parison to the value of the boat and equipment involved, and the boat owner is well aware of the various types of risks that are involved and associated with the storage, handling, and other work performed on his boat on the Boston Harbor Marina, Inc. premises; therefore it is understood and agreed that all boats handled, stored or repaired by Boston Harbor Marina, Inc. are subject to the following terms and conditions:

   *    *    *    *    *    *

8. The owner agrees that the boat will not be left for storage in a condition to be a fire hazard and further agrees to carry appropriate insurance coverage during the period of this contract."

The first problem concerns this Court's jurisdiction.

■ Although the parties are now a California corporation and a Massachusetts corporation, the damages claimed are only $9,500, so diversity jurisdiction does not lie. 28 U.S.C. § 1332(a).

But there is a basis of admiralty jurisdiction with respect to the contract claim, though not with respect to the tort claim set forth in the complaint.

■ For convenience, the claim sounding in tort may be disposed of first. When the yacht was damaged it was on land. The damage was caused by strictly land-based actors and actions. There is, therefore, no basis for alleging maritime tort. The Plymouth, 70 U.S. (3 Wall) 20, 18 L.Ed. 125 (1866). But, as appears in the following discussion the contract claim is well-pleaded and falls within the admiralty jurisdiction.

There has been some difference of opinion as to (1) whether the admiralty and maritime clause of Article II of § 2 of the United States Constitution confers upon federal courts jurisdiction over contracts for the winter storage of vessels withdrawn from the water; [compare Murray v. Schwartz, 175 F.2d 72 (2nd Cir., 1949) with Hercules Co. v. The Brigadier General Absolom Baird, 214 F.2d 66 (3rd Cir., 1954) and The Artemis, 53 F.2d 672, 680 (S.D.N.Y., 1931). See Benedict, Admiralty, 6th ed. §§ 66 and 67; Gilmore and Black, The Law of Admiralty, p. 25 note 92, and p. 543;] and, if so, (2) whether such contracts require application of a uniform federal maritime law or permit the application to such contracts of diverse local state laws.

A direct reply to those broad questions can be avoided in this case (though, as will appear, this Court's narrow decision almost inevitably implies affirmative answers to the broad questions) because the contract at bar is not for winter storage *simpliciter* but involves the additional element of repair and servicing during winter storage. See North. Pac. S. S. Co. v. Hall Bros. Co., 249 U.S. 119, 39 S. Ct. 221, 63 L.Ed. 510 (1918) (Pitney, J.).

In England, Coke and other English common law judges in the Seventeenth Century succeeded in prohibiting admiralty courts from exercising jurisdiction over *in personam* suits on ship repair contracts—though the admiralty, at least after 1632, retained *in rem* jurisdiction over suits for building or "amending" a suit brought against the vessel itself. Holdsworth, A History of English Law, vol. 1, p. 556. Blackstone in his Commentaries, vol. 3, p. 106, relying on Co.Litt. 261, accepted the doctrine that "if part of any contract doth arise upon the sea, and part upon the ground, the common law excludes the admiralty court from its jurisdiction."

Despite their hostility to the vice-admiralty courts in the colonies [see Holdsworth, vol. XI, p. 61], and the specific grievances arising therefrom recited in the Declaration of Independence, the Framers of the United States Constitution gave to the federal courts a broader jurisdiction than the admiralty courts of England enjoyed. Addition of the word "maritime" to "admiralty" in Article III, Sec. 2 of the United States Constitution was made *ex industria* to underline the point. De Lovio v. Boit, 2 Gall. 398, 7 Fed.Cas. No. 3,776, p. 418 (C.C.D.Mass.

1815). The first gifted interpreter of that Article and Section, Justice Story, in the case just cited, in what he and his filial biographer both regarded as his "most elaborate" opinion [see, William W. Story, The Life and Letters of Joseph Story, vol. I, pp. 263, 270], after examining early English law, and statutes commencing with the reign of Richard II, concluded that Coke had perverted history. Story enunciated the doctrine that maritime jurisdiction embraced all maritime contracts. Though *De Lovio* was addressed to an insurance contract, the principle became more broadly applicable. A convenient summary of contemporary reactions by Chief Justice Marshall and lower court judges will be found at p. 265 of the Story biography. Moreover, Story wrote in private letters that his decision won plaudits from merchants because "in mercantile cases they are not fond of juries." [Ibid, p. 270].

By the end of the Nineteenth Century there was no doubt that ship repair contracts were maritime and within the admiralty jurisdiction. North Pac. S. S. Co. v. Hall Bros. Co., 249 U.S. 119, 39 S. Ct. 221, 63 L.Ed. 510 (1918) (Pitney, J.); Endner v. Greco, S.D.N.Y., 3 F. 411 (1880) (Choate, D. J.). See Ex parte Easton, 95 U.S. 68, 75, 24 L.Ed. 373 (1875) (Clifford, J.); Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961) (Harlan, J.). Acknowledgement of the rule was made in 1873 by O. W. Holmes, Jr., relying on R. H. Dana, Jr.'s scholarship, in the elaborate notes he made to the 12th edition of Kent's Commentaries on American Law, vol. I, pp. 369–370 (1873).

By analogy, the rule was applied to wharfage contracts on the ground that such contracts were customary aspects of the management of vessels, Ex parte Easton, 95 U.S. 68, 72–77, 24 L.Ed. 373 (1875).

It was also applied to winter storage contracts when there was some element of repair. See the master's report adopted by that excellent admiralty judge, Woolsey, D. J., in The Artemis, 53 F.2d 672 (S.D.N.Y.) (1931) followed in The Mendotta II, 13 F.Supp. 1019, 1020 (E.D. N.Y.1935) (Inch, D. J.) and City of Erie v. S. S. North American, 267 F.Supp. 875 (1967) (Weber, D. J.).

■ A repair-storage contract being subject to federal admiralty jurisdiction, the next inquiry is whether though the contract is maritime, it is nonetheless local in the sense that the application of state law would not disturb the uniformity of maritime law. Kossick v. United Fruit Co., 365 U.S. 731, 735, 81 S.Ct. 886, 6 L.Ed.2d 56 (1961). (Harlan, J.)

■ Uniformity rather than local variation ought to prevail in construing contracts of a customary and universal kind, particularly when they relate primarily to inaminate ships moving from port to port rather than to individuals, such as seamen, who may have significant local roots or contacts. Winter storage and repair contracts are each a "normal phenomenon in maritime affairs." Ibid p. 742, 81 S.Ct. 886. They are, in this respect, like the wharfage contracts in Ex parte Easton, 95 U.S. 68, 72–77, 24 L.Ed. 373. Moreover, in the case at bar there is a presumption in favor of applying federal law, which, as will later be observed, would support the contract at bar,—a conclusion doubtful under local state law. A contract voluntarily undertaken creates some presumption in favor of applying that law tending toward the validation of the alleged contract. Kossick, supra, 365 U.S. 731 at p. 741, 81 S.Ct. 886, relying on authoritative expositors such as Professor A. Ehrenzweig. See his Contracts in the Conflict of Laws, Part One: Validity. 59 Col.L.Rev. 973. Finally, there is no reason to suppose that contracts for repair and storage of yachts are matters of special concern to the states, or reveal significant differences reflecting deep-dyed local practice, preference, and public policy.

■ It follows that this is not a case which is governed by Massachusetts local law. Even if it were, it could not be concluded with certainty that a contract for

storage of a yacht would be within the reach of the local law upon which reliance has been placed, that is the Warehouse Receipts article in the Uniform Commercial Code, Mass.G.L. c. 106, Article 7, especially 7–102(1) (f) and (h), 7–202, and 7–204. Despite the breadth of its words, the Commercial Code's history does not show that it was intended to reach, or did reach, contracts for storage of vessels, which obviously present (by virtue of their physical character, their place of storing, and the customs and expectations of the parties,) peculiar problems. Differences between storage of ordinary goods and storage of vessels laid up during the off-season might make it unreasonable to apply the full impact of a general law applicable to warehousemen of the usual kind to situations arising from the storage, so-called, of vessels. Verbal identity in the word "storage" used in two quite different contexts should not conceal fundamental disparities. Doing so merely illustrates Professor Thomas Reed Powell's caustic definition of "the legal mind" as one that can think of something inevitably attached to something else without considering to what it is attached.

■ There remains the issue whether under federal maritime law the present contract is objectionable. No reason appears why a yard may not contract to store at an agreed-upon low rate a vessel on the express, uncoerced understanding that the owner of the vessel bears the risk of loss by fire or other casualty. Such a contract often is strongly in the interest of the owner who secures storage at a rate made lower by the fact that the yard need not run the risk of loss, and need not prudently insure itself against such a risk. Taking advantage of the low rate, the owner may, as indeed the instant owner Feinberg did, insure himself, and pay what he saved in yard charges to an insurer as a premium.

The motion for summary judgment must be granted because defendant validly eliminated any contractual liability for the owner's loss due to unexplained fire damage, and because defendant, if it were negligent, is not subject to the jurisdiction of this Court on so much of plaintiff's claim as sounds in tort on a claim of negligence.

Defendant's motion for summary judgment granted.