**FIREMAN'S FUND AMERICAN INSURANCE COMPANY, Plaintiff, Appellant,**

v.

**BOSTON HARBOR MARINA, INC., Defendant, Appellee.**

**No. 7153.**

United States Court of Appeals First Circuit.

Heard Dec. 3, 1968.

Decided Jan. 31, 1969.

Richard A. Dempsey, Boston, Mass., with whom Glynn & Dempsey, Boston, Mass., was on brief, for plaintiff-appellant.

Donald P. Wieners, Boston, Mass., with whom Burke, Monaghan & McGrath, Boston, Mass., was on brief, for defendant-appellee.

Before ALDRICH, Chief Judge, McENTEE and COFFIN, Circuit Judges.

ALDRICH, Chief Judge.

During the winter season 1965–66 the yacht Noruna VI, owned by one Feinberg, a citizen of Massachusetts, was stored inside a building belonging to defendant Boston Harbor Marina, Inc., a Massachusetts corporation. The storage contract provided that Feinberg would carry his own insurance and that the yard "will not be liable for loss of or damage to said property under any circumstances including, but not limited to fire, theft, vandalism, water damage and any negligent acts or omissions and notwithstanding any asserted or actual breach of this contract * * *." In January the yacht was substantially damaged by fire. Feinberg brought the present suit against the defendant yard, and made a claim against his insurer, Fireman's Fund Insurance Company. The insurer

having paid, it asserted subrogation and was substituted as party plaintiff herein.

In answer to defendant's proffer of the contractual exculpatory clause, plaintiff stated that this cause was invalid by virtue of the Uniform Commercial Code's prohibition of such limitations in contracts for the storage of goods. Mass. G.L. c. 106, §§ 7–102(1) (f), (h), 7–202 (3), 7–204 (1958). The defendant sought to test the applicability of this enactment by moving for summary judgment, conceding, for this purpose, that the fire was due to its own negligence. In a comprehensive opinion, 285 F.Supp. 36, D.C., the district court granted the motion, holding that state law and federal policy were in conflict, and that a uniform federal rule should prevail. Plaintiff appeals.

The first question is one of jurisdiction. The present plaintiff is a foreign corporation, but, even assuming that this substitution may properly relate back to the original complaint, the damage to the yacht fell short of the amount needed to support diversity jurisdiction. The district court held that there was no admiralty jurisdiction for a claim sounding in tort because of its strictly land-based nature. This was correct. The Plymouth, 1866, 70 U.S. (3 Wall.) 20, 18 L.Ed. 125; Hastings v. Mann, 4 Cir., 1965, 340 F.2d 910, cert. denied 380 U.S. 963, 85 S.Ct. 1106, 14 L.Ed.2d 153. The court's demonstration of admiralty jurisdiction for a claim in contract, however, has persuaded both parties as well as ourselves. See, e. g., North Pac. S. S. Co. v. Hall Bros. Marine Ry. & Shipbldg. Co., 1919, 249 U.S. 119, 39 S.Ct. 221, 63 L.Ed. 510; The Artemis, S.D.N.Y., 1931, 53 F.2d 672, 679. At the same time we note, in connection with the critical question whether maritime law should defer to local policy, that this is a peripheral area of admiralty power. See

Hercules Co. v. Brigadier Gen Absolom Baird, 3 Cir., 1954, 214 F.2d 66, 68–69; Murray v. Schwartz, 2 Cir., 1949, 175 F.2d 72; cf. 1 E. Benedict, American Admiralty 309–10 (6th ed. 1940).

The next question is whether, as a matter of interpretation, the Uniform Commercial Code purports to apply to onshore storage of a yacht. Plaintiff says that there are certain contractual differences between ordinary storage contracts and this one, notably that the yard was to do the maintenance work on the vessel. This undertaking, however, was separately charged for. Even if it is of some consequence, the performance of incidental activities with respect to the goods during the period of storage does not, for the purposes of state law, alter the existence of an underlying storage contract, at least during a period of inactivity. See Bean v. Security Fur Storage Warehouse, Inc., 1962, 344 Mass. 674, 184 N.E.2d 64. Equally, in view of the broad statutory definition of "goods," we do not think it can be said that a yacht, as distinguished from other personal property, falls outside the statutory ambit.[1]

We do not agree with the district court that the Massachusetts statute evidences no interest in the present contract, but we do agree that federal law must govern if, as a matter of federal policy, the Massachusetts provision should not be recognized. Kossick v. United Fruit Co., 1961, 365 U.S. 731, 738–742, 81 S.Ct. 886, 6 L.Ed.2d 56; cf. Wilburn Boat Co. v. Fireman's Fund Ins. Co., 1955, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337. An affirmative answer to this question subsumes that federal policy permits such agreements. The court, without discussion of authorities, held that it did.[2] We do not find this an easy assumption.

[1] " 'Goods' means all things which are treated as movable for the purposes of a contract of storage or transportation." Mass.G.L. c. 106, § 7–102(f) (1958). Cf. Silver v. Sloop Silver Cloud, S.D. N.Y., 1966, 259 F.Supp. 187.

[2] "No reason appears why a yard may not contract to store at an agreed-upon low rate a vessel on the express, uncoerced understanding that the owner of the vessel bears the risk of loss by fire or other casualty. Such a contract often is

Although the parties did not brief this issue, we must start with the Supreme Court's forceful disapproval of exculpatory clauses in Bisso v. Inland Waterways Corp., 1955, 349 U.S. 85, 75 S.Ct. 629, 99 L.Ed. 911. There the court invalidated, as against public policy, a provision in a contract of towage relieving the towboat from liability for negligence and placing upon the tow all risk of loss. In describing this case in a later opinion the Court said,

"There a barge, while being towed on the Mississippi River by a steam towboat under a private towage contract, was caused by the negligence of those operating the towboat to collide with a bridge pier and sink. The Court reviewed prior cases in the field, and concluded that the conflict of decision found in those cases should be resolved by declaring private contractual provisions of the kind there involved altogether void as contrary to 'public policy.' The Court relied on 'two main reasons' for its conclusion, (1) that such a rule was necessary 'to discourage negligence,' and (2) that the owner of the tow required protection from 'others who have power to drive hard bargains.' As was pointed out explicitly in a concurring opinion, the Court's decision was perforce reached without consideration of particularized economic and other factors relevant to the organization and operation of the tugboat industry."

SW. Sugar & Molasses Co. v. River Terminals Corp., 1959, 360 U.S. 411, 416, 79 S.Ct. 1210, 1214, 3 L.Ed.2d 1334. In the dissenting opinion in Bisso it was said, 349 U.S. at 119, 75 S.Ct. at 647,

"[T]he question ultimately is whether public policy requires that the tug, rather than the tow, shall bear the cost of insurance. Indeed, in all likelihood, the economic burden will fall upon the tow in either case." The Court was not moved by this consideration, however, and Bisso has since been reaffirmed. Dixilyn Drilling Corp. v. Crescent Towing & Salvage Co., 1963, 372 U.S. 697, 83 S.Ct. 967, 10 L.Ed.2d 78.

River Terminals, supra, cast some light as to one limit of Bisso, since it recognized that if adequate protection existed against the contractor's driving a hard bargain, there proposed rate control by the ICC, this would be sufficient. See American S. S. Co. v. Great Lakes Towing Co., 7 Cir. 1964, 333 F.2d 426, 430, cert. denied, 379 U.S. 889, 85 S.Ct. 160, 13 L.Ed.2d 93; cf. Alcoa S. S. Co. v. Charles Ferran & Co., 5 Cir., 1967, 383 F.2d 46, 55. However, the Court did not say what less than ICC supervision would be acceptable. And in Dixilyn, supra, four years later, the Court made no reference to the findings of the courts below that the towing company there in question had, in fact, no excessive economic power.[3] Finally, in exploring the extent of the Bisso prohibition, we cannot leave unnoticed the fact that in Bisso itself the Court called its decision "merely a particular application to the towage business of a general rule long used by courts and legislatures to prevent enforcement of release-from-negligence contracts in many relationships such as bailors and bailees * * *." 349 U.S. at 90–91, 75 S.Ct. 632.[4] While the authorities cited for this proposition involved concentration of economic pow-

strongly in the interest of the owner who secures storage at a rate made lower by the fact that the yard need not run the risk of loss, and need not prudently insure itself against such a risk. Taking advantage of the low rate, the owner may, as indeed the instant owner Feinberg did, insure himself, and pay what he saved in yard charges to an insurer as a premium." 285 F.Supp. at 41.

3. See Crescent Towing & Salvage Co. v. Dixilyn Drilling Corp., 5 Cir., 1962, 303 F.2d 237, 246–247.

4. See also Sun Oil Co. v. Dalzell Towing Co., 1932, 287 U.S. 291, 53 S.Ct. 135, 77 L.Ed. 311, where the Court, in supporting an exculpatory clause in a pilotage agreement, expressly noted that no bailment was involved.

er, the breadth of the Court's language does not encourage us to be quick to distinguish it. In the present case we do not even have evidence whether a yacht owner can obtain storage on such arrangements as he wishes, or whether the printed form contract tendered by the defendant is unavoidable.

Furthermore, the Court's language in *Bisso* makes us even slower to find a basis for holding that federal policy denies the applicability of a local prohibition. Even if, on a fuller record, we were to conclude that admiralty law would not be opposed to an exculpatory clause in the present situation, it is another matter to convert toleration into insistence. As the court suggested, a boatowner who already has a comprehensive marine policy might be pleased to pay a storage rate that did not include any charge for the yard's obligation of reasonable care,[5] but we do not know that all boatowners carry such insurance, or would wish, if they had the choice, to release a yard from responsibility. They might fear the very indifference to hazards stated as one of the reasons for the Court's decision in *Bisso*.

The storage of boats ashore seems to us invested with a substantial local interest. Since, however, there is a possibility of a fuller record, and neither the district court nor the parties have considered the implications of *Bisso*, we will make no final pronouncement as to this aspect of the case, either. We merely remark that the burden on the defendant is not a light one.

The judgment of the district court is vacated, and the case remanded for further proceedings not inconsistent herewith.

---

5. It is not clear that even here this would be wholly advantageous. We do not know what would be the effect, short term or long term, upon the boatowner's own insurance if he were to foreclose subrogation rights. See 16 G. Couch, Insurance 342–47 (2d ed. 1961). We do know that under increase-of-hazard provisions the size of the insured's premium depends upon whether he has increased the company's risk of loss, 8 Id. 307–08, and that, at least in some cases, prior loss and indemnity will be material to the risk under subsequently issued policies. 7 Id. 762; cf. 2 J. Arnould, Marine Insurance 634 (15th ed. 1961).