USCA1 Opinion

 

 June 22, 1995 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1764 WINDSOR MOUNT JOY MUTUAL INSURANCE COMPANY, Plaintiff - Appellant, v. JOHN GIRAGOSIAN AND DEBORAH GIRAGOSIAN, Defendants - Appellees. ____________________ ERRATA SHEET The opinion of this court issued on June 16, 1995 is amended as follows: Bottom of page 8, the last two lines should be placed in quotation marks and read: "in deference to state hegemony over insurance, to discourage the fashioning of new federal law and to favor the application of state law." UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 94-1764 WINDSOR MOUNT JOY MUTUAL INSURANCE COMPANY, Plaintiff - Appellant, v. JOHN GIRAGOSIAN AND DEBORAH GIRAGOSIAN, Defendants - Appellees. ____________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. William G. Young, U.S. District Judge] ___________________ ____________________ Before Torruella, Chief Judge, ___________ Coffin, Senior Circuit Judge, ____________________ and Cyr, Circuit Judge. _____________ _____________________ Michael J. Calabro, with whom Flanagan & Hunter, P.C., was ___________________ ________________________ on brief for appellant. Thomas M. Neville, with whom Segalini & Neville, was on __________________ ___________________ brief for appellees. ____________________ June 16, 1995 ____________________ TORRUELLA, Chief Judge. Windsor Mount Joy Mutual TORRUELLA, Chief Judge. ____________ Insurance Company ("Windsor") sought a declaration from the district court of its rights and obligations with respect to an insurance policy held by John and Deborah Giragosian for their 34-foot sailboat Escape, which had sunk in Boston Harbor. The ______ Giragosians counterclaimed for contract damages due to Windsor's allegedly improper failure to honor the policy.1 After a bench trial, the district court determined that Windsor had a contractual duty to indemnify the Giragosians in the stipulated loss amount of $58,000. Windsor now appeals this ruling. For the following reasons, we affirm. BACKGROUND BACKGROUND In 1989, the Giragosians purchased the Escape, a 1987 ______ model 34-foot Catalina sailboat with a 12-horsepower diesel auxiliary. The Giragosians insured the Escape with Windsor under ______ a fairly standard marine insurance policy which contained the following warranty of seaworthiness: Seaworthiness Warranty. Warranted that at the inception of this Policy the vessel shall be in a seaworthy condition and, thereafter, during the term of this Policy, the Assured shall exercise due diligence to maintain the boat in a seaworthy condition. In the months before the Escape was lost, ______ Mr. Giragosian's adverse experiences relating to the vessel were  ____________________ 1 The Giragosians also counterclaimed for violations of Mass. Gen. L. chapters 93A and 176D, prohibiting unfair and deceptive practices in the business of insurance. The district court ruled that Windsor did not commit any unfair or deceptive trade practices, and the Giragosians do not appeal this decision. -2- limited to the following: During one excursion, Giragosian ran the vessel aground, and called for help using his radio. Occasionally, the diesel engine stalled. In August of 1991, the engine stalled as Giragosian was entering Scituate Harbor after a pleasure cruise. He was unable to restart the engine, and thus obtained permission to moor the vessel in Scituate Harbor. Most significantly, on October 19, 1991, someone noticed that the Escape was lying very low in the water and the Coast Guard was ______ called to pump the boat out. The Coast Guard pumped out the vessel and promptly informed the Giragosians of the situation. Giragosian went to Scituate Harbor on October 24, 1991, accompanied by his friend Daniel Likely. The two planned to sail the Escape to the Bay Point Marina in Quincy to have it hauled ______ for the season. Giragosian and Likely rowed to where the Escape ______ was moored. Once on board, however, they realized that the locks to her cockpit had been changed by the Coast Guard personnel who had pumped the boat out five days earlier. Giragosian came ashore and retrieved the key from the Coast Guard station. At the station, Giragosian had a conversation with Coast Guard officials, who suggested that perhaps the water had gotten into the vessel's bilges by running down the mast, i.e., that it was ____ rainwater. After retrieving the key from the Coast Guard, Giragosian and Likely returned to the Escape, boarded the boat, ______ and prepared to cast off. Before the Escape left Scituate ______ Harbor, Giragosian looked into the bilge and noticed one to two -3- inches of water. He considered this to be normal. He also noticed water stains indicating that there had been about six inches of water in the bilges at one time. Giragosian unsuccessfully attempted to start the vessel's diesel engine. Because the batteries were low, Giragosian turned off the radio, but kept the depthfinder on throughout most of the voyage. Because he intended to operate by "dead reckoning" from Scituate Harbor to the Bay Point Marina, Giragosian did not think that he needed the electronic equipment. He also decided to make the trip solely under sail, as the winds were light, the day clear, and the sea calm. At about 3:00 p.m., Giragosian headed the Escape out of ______ Scituate Harbor under sail, towing a small inflatable dingy behind. He sailed northeast out of Scituate Harbor, navigating by compass and dead reckoning. He estimated that he was sailing at about six knots. At around 4:30 p.m., his depthfinder failed. Later, between 5:00 and 6:00 p.m. and well out in greater Boston Harbor, Giragosian noticed that his floorboards were now covered with sloshing water and that they had begun to float. He checked the bilges and found that they contained about four feet of water, so he and Likely attempted to pump the water out manually. At this point, the Escape still had sufficient power to operate ______ the navigation lights, but only dimly. Giragosian tried to go below to get a flashlight, but could not find one as the water was now flooding the cockpit and the flashlight was underwater. He tried to use his radio tocall for help, but could raise noone. -4- It was getting close to sunset, and the sea had become slightly choppy. Giragosian and Likely donned life preservers, retrieved the flare gun, dropped the sails, and hooked up the outboard motor to the inflatable dinghy. They abandoned the Escape and started toward a drilling rig light some distance away ______ in the harbor. Their dinghy engine ran out of gas, so it took them two hours to paddle by hand to the rig, where they were rescued after some time by the Coast Guard. Neither Giragosian nor Likely saw the Escape go down. The Coast Guard searched for ______ the vessel but was unable to find any sign of it. The Giragosians gave proper notice to Windsor. Windsor conducted its own search for the vessel with underwater detection devices. This search, however, proved futile, and the Escape was ______ never seen again. Windsor eventually denied Giragosian's claim. The district court found, based on the totality of the facts and circumstances presented during trial, that the water pumped out of the hold of the vessel by the Coast Guard had not actually come down the mast, but rather was the result of a leak in the hull, a defect which was aggravated by Giragosian's attempts to sail the boat. The court went on to find, however, that Giragosian was not actually aware that the vessel was leaking at or below the waterline, and he did not know or appreciate that sailing the vessel was aggravating the leak. The district court found that the Escape was in a ______ seaworthy condition at the commencement of the policy's coverage, and that the Giragosians exercised due diligence to maintain the -5- boat in this condition. The court went on to find that the Escape was, however, unseaworthy on October 24, 1991 when ______ Giragosian and Likely sailed her out into open waters. The court specifically found, however, that Giragosian did not know of the boat's unseaworthy condition, and that the condition was not caused by any lack of due diligence on Giragosian's part. The court nevertheless ruled as a matter of law that Giragosian was negligent in taking the Escape out to sea on ______ October 24, 1991. According to the court, the "objective combination of the facts" -- that he knew that his boat had been low in the water and had been pumped out by the Coast Guard, and that he was aware that he had no auxiliary power and that his batteries were low -- rendered Giragosian's decision to sail the Escape negligent. Yet this negligence, the court explained, did ______ not necessarily preclude coverage under the insurance policy. Despite his negligence, the court concluded, Giragosian had not failed to exercise due diligence in maintaining the boat's seaworthiness, and therefore he is entitled to indemnification from Windsor under the policy. Windsor now appeals. STANDARD OF REVIEW STANDARD OF REVIEW Our standard for reviewing a district court's findings of fact and conclusions of law made in conjunction with a bench trial is well settled. We review claimed errors of law de novo. __ ____ Williams v. Poulos, 11 F.3d 271, 278 (1st Cir. 1993); Blanchard ________ ______ _________ v. Peerless Ins. Co., 958 F.2d 483, 487 (1st Cir. 1992). The __________________ district court's findings of fact, however, will not be set aside -6- unless they are demonstrated to be clearly erroneous. Williams, ________ 11 F.3d at 278; Fed. R. Civ. P. 52(a). In other words, we will give such findings effect unless, after carefully reading the record and according due deference to the trial court, we form "a strong, unyielding belief that a mistake has been made." Cumpiano v. Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st ________ ____________________________ Cir. 1992). Where there are two permissible views of the evidence, the interpretation assigned by the trial court will therefore be adopted. Williams, 11 F.3d at 278. ________ "The clearly erroneous standard also ordinarily applies to our review of a district court's resolution of mixed questions of law and fact. In such situations, however, we are obligated to determine whether the court's decision was infected by legal error. And if a trial court bases its findings upon a mistaken impression of applicable legal principles, the reviewing court is not bound by the clearly erroneous standard." Id. (internal __ quotations omitted). ANALYSIS ANALYSIS Windsor appeals the district court's decision on several grounds. First, Windsor contends that the court applied an incorrect legal standard both to the interpretation of the warranty of seaworthiness in the marine insurance policy, and to the warranty's "due diligence" requirement. Windsor also argues that certain factual findings of the district court are inconsistent, and that as a matter of law, the terms of the -7- insurance policy preclude coverage for loss due to a "latent defect." We address these arguments in turn. A. Did the district court apply the appropriate legal A. Did the district court apply the appropriate legal __________________________________________________ standard for interpreting the warranty of standard for interpreting the warranty of __________________________________________________ seaworthiness? seaworthiness? _____________ In interpreting the marine insurance policy, particularly the warranty of seaworthiness, the district court applied principles of Massachusetts insurance law rather than the maritime doctrine, applicable in marine insurance cases, of uberrimae fidei.2 Citing Wilburn Boat Co. v. Fireman's Fund ________________ _________________ _______________ Ins. Co., 348 U.S. 310, 320-21 (1955), the court explained that ________ "regarding matters of insurance, . . . the doctrine of uberrimae _________ fidei gives way to the state's . . . interests in regulating the _____ relationship between insurer and insured." Appellant Windsor now argues that this choice of law ruling was erroneous.  The propriety of maritime jurisdiction over a suit involving a marine insurance policy is unquestionable. Albany ______ Ins. Co. v. Wisniewski, 579 F. Supp. 1004, 1013 (D.R.I. __________ __________ 1984)(citing Kossick v. United Fruit Co., 365 U.S. 731, 735 _______ _________________ (1961); Wilburn Boat, 348 U.S. at 313). When, however, no ____________ established maritime rule governs the issues of a marine insurance dispute, the Wilburn Boat inquiry becomes applicable. _____________ In the absence of a settled federal maritime rule, Wilburn Boat ____________ has generally been interpreted, "in deference to state hegemony over insurance, to discourage the fashioning of new federal law  ____________________ 2 "The most perfect good faith." Black's Law Dictionary 1363 (5th ed. 1979). -8- and to favor the application of state law." Albany Ins. Co., 579 _______________ F. Supp. at 1013-14 (listing cases). Where, on the other hand, a settled maritime rule directly governs the litigation, that rule controls. See Ingersoll Milling Mach. Co. v. M/V Bodena, 829 ___ ____________________________ __________ F.2d 293, 305-06 (2d Cir. 1987), cert. denied sub nom. J.E. _______________________ ____ Bernard & Co. v. Ingersoll Milling Mach. Co., 484 U.S. 1042 _______________ _____________________________ (1988). State law may supplement maritime law when maritime law is silent or a local matter is at issue, but state law may not be applied where it is materially different from maritime law, or where it would defeat the reasonably settled expectations of maritime actors. See Albany Ins. Co. v. Anh Thi Kieu, 927 F.2d ___ ________________ ____________ 882, 887 (5th Cir. 1991); Floyd v. Lykes Bros. S.S. Co., Inc., _____ ___________________________ 844 F.2d 1044 (3d Cir. 1988); Coastal Iron Works, Inc. v. Petty _________________________ _____ Ray Geophysical, Div. of Geosource, Inc., 783 F.2d 577 (5th Cir. _________________________________________ 1986); Steelmet, Inc. v. Caribe Towing Corp., 747 F.2d 689, 695 ______________ ___________________ (11th Cir. 1984); Fireman's Fund Am. Ins. Co. v. Boston Harbor ____________________________ _____________ Marina, Inc., 406 F.2d 917, 919 (1st Cir. 1969); cf. Pace v. ____________ __ ____ Insurance Co. of No. Am., 838 F.2d 572 (1st Cir. 1988)(holding ________________________ that the admiralty clause of the U.S. Constitution did not necessarily bar a state law claim against a maritime insurer for its bad faith refusal to honor a claim). Given these choice-of-law principles, the narrower issue is whether an established rule of maritime law is applicable to the dispute at bar. If a maritime rule controls the disputed issue, and that rule is materially different from ___ state law, then the district court's decision to abandon maritime -9- law was legal error. Windsor argues that the doctrine of uberrimae fidei3 is directly applicable here, and that the ________________ district court should have employed this doctrine rather than Massachusetts insurance law in formulating its conclusions. We need not undertake this analysis, however, because we find that the stringent uberrimae fidei doctrine does not ________________ relieve Windsor of its liability to the Giragosians under the policy. True, the doctrine requires the parties to a marine insurance policy to accord one another the highest degree of good faith. Knight v. U.S. Fire Ins. Co., 804 F.2d 9, 13 (2d Cir. ______ ___________________ 1986). In particular, the doctrine imposes a strict duty on the insured to disclose to the insurer all known circumstances that materially affect the insurer's risk, the default of which duty renders the insurance contract voidable by the insurer. Id. __ Once policy coverage has commenced, the doctrine imposes an equally strict, continuing obligation on the vessel owner to ensure that the vessel will not, through either bad faith or neglect, knowingly be permitted to break ground in an unseaworthy _________  ____________________ 3 The doctrine traditionally applied to insurance law in general. See Stipchich v. Metropolitan Life Ins. Co., 277 U.S. ___ _________ __________________________ 311, 316 (1928)("Insurance policies are traditionally contracts uberrimae fidei and a failure by the insured to disclose ________________ conditions affecting the risk, of which he is aware, makes the contract voidable at the insurer's option."). Insurance law is primarily a matter of state concern, however, and over the years most states, including Massachusetts, have abandoned the strict uberrimae fidei doctrine for insurance policies generally. See _______________ ___ Anh Thi Kieu, 927 F.2d at 888 (tracing history of doctrine). _____________ Today, virtually the sole remaining vestige of the doctrine is in maritime insurance law. Id. Even then, however, it is debatable __ whether the doctrine can still be deemed an "entrenched" rule of law. Id. at 889-90 (discussing marine insurance cases in which __ courts refused to apply doctrine in its strictest form).  -10- condition. Austin v. Servac Shipping Line, 794 F.2d 941 (5th ______ _____________________ Cir. 1986)(citations omitted)(emphasis added).4 The doctrine has long been considered to be one of limited applicability, however, in light of the Supreme Court's Wilburn Boat decision, ____________ see 348 U.S. at 316-317 (explaining limitations of doctrine in ___ marine insurance contract context). Whatever the exact extent of the applicability of the strict uberrimae fidei standard, we ________________ cannot believe that in these times it requires a pleasure boat owner to notify the insurer every time the craft takes on a small amount of water, or has engine trouble, at pain of losing coverage. As the district court specifically found, the Escape ______ was indeed unseaworthy when Giragosian set sail, but he did not know of its unseaworthy condition, and the condition was not the result of his neglect or lack of due diligence. Windsor does not challenge these factual findings, but instead argues that Giragosian failed to exercise due diligence in ascertaining the vessel's condition before setting sail on August 24, 1991. We disagree. Although the Coast Guard had recently pumped her out, the officials told Giragosian that the water had probably run down the mast, and Giragosian was certainly reasonable in accepting their opinion. Windsor claims that Giragosian should have consulted a marine mechanic in Scituate. As a matter of law, however, we do not think that the doctrine of uberrimae _________  ____________________ 4 Although strict, this continuing obligation is not "absolute," contrary to Windsor's assertions. -11- fidei requires boat owners to hire mechanics, at the risk of _____ losing their insurance coverage, every time a boat takes on small amounts of water. As any boat owner knows, most boats leak at some time. Moreover, a full five days after the Coast Guard had pumped water out of the vessel, Giragosian found only one to two inches of water in the bilges -- a normal amount for the Escape - ______ - and the water was easily pumped out.5 These circumstances simply do not support a conclusion that the district court committed clear error in finding Giragosian duly diligent in maintaining and ascertaining the seaworthiness of the Escape ______ before setting sail on August 24, 1991. We therefore affirm the district court's determination that Giragosian did not breach the warranty of seaworthiness of the insurance policy.6 B. Were the district court's factual findings B. Were the district court's factual findings __________________________________________________ inconsistent? inconsistent? ____________ Windsor also claims that the district court's factual finding that the sinking of the Escape was due to a "latent ______ defect" is inconsistent with its alleged finding that the  ____________________ 5 We agree with the Giragosians that the case of Prado, Inc. v. ___________ Lexington Ins. Co., 1990 WL 255535, *8 (D. Mass. 1990), aff'd, ___________________ _____ 930 F.2d 906 (1st Cir. 1991), is entirely distinguishable. In that case, although their vessel had been leaking considerably for an extended period of time, the insureds made absolutely no attempt to ascertain the source of the highly unusual amount of water in the vessel, and did not consult with either Coast Guard personnel or mechanics. These facts are not present here. 6 Our conclusion is unaffected by the district court's determination that Giragosian was negligent for setting sail in the Escape that day because he had no auxiliary power and a low ______ radio battery. For as the district court also correctly held, his decision to set sail, negligent or not, is simply irrelevant to whether he was in breach of the insurance policy's warranty of seaworthiness. -12- Giragosians were "on notice" of the boat's condition. In support of this argument, Windsor claims that "latent defect" is a term of art meaning a flaw which is not discoverable through inspection by a reasonably skilled person. Because Giragosian was "on notice" of the vessel's condition, Windsor argues, the Escape's defect could not have been latent, and Giragosian lacked ______ due diligence in finding it. As the Giragosians correctly point out, however, nothing in the district court's findings even suggest that Giragosian was "on notice" of the boat's defect; to the contrary, the court specifically found that Giragosian did not know of it. ___ Based on the evidence, we see no inconsistency, much less clear error, in the court's factual findings. Furthermore, when read in context, it is clear that the district court did not employ the term "latent defect" as a term of art, but merely in the ordinary, common-sense meaning of the phrase -- i.e., an unknown ____ or unsuspected flaw. Essentially, Windsor's argument here is a reiteration of their previous contention that Giragosian should have located the source of the water in the bilges, and that his failure to do so constitutes lack of due diligence. As we explained above, however, the district court's determination that Giragosian was duly diligent was not clear error. Accordingly, we affirm the district court's findings and reject Windsor's contention on this point.7  ____________________ 7 Windsor also argues that accepting the district court's finding that the leak in the Escape's hull was a "latent defect," ______ the policy does not provide coverage for the boat's loss. In -13- CONCLUSION CONCLUSION For the foregoing reasons, we affirm the judgment of ______ the district court.  ____________________ support of this contention, Windsor points to two paragraphs in the policy. The first paragraph states that the policy provides coverage for any physical loss or damage from "any external cause." The second paragraph specifically excludes from coverage "loss, damage or expense arising from or in consequence of . . . the repair or replacement of a part in which a latent defect has been found, mechanical breakdown or faulty manufacture. . . ." Under the language of these clauses, Windsor contends, coverage should have been denied. Windsor raises these arguments now for the first time, never having presented any evidence nor, as far as the record shows, even discussed these clauses before the district court. Because Windsor most certainly could have raised these arguments below and gives no explanation for its failure to do so, we deem the arguments waived. Havinga v. Crowley Towing & Trans. Co., 24 _______ ____________________________ F.3d 1480, 1483 (1st Cir. 1994); FDIC v. Caporale, 931 F.2d 1, 2 ____ ________ (1st Cir. 1991).  -14-